IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNITED STATES OF AMERICA,          .
                                   . Case No. 4:20-CR-00288-DPM-1
PLAINTIFF,                         .
                                   . Little Rock, Arkansas
VS.                                . August 10, 2021
                                   . 10:01 A.M.
MUJERA BENJAMIN LUNGAHO,           .
                                   .
DEFENDANT.                         .
   . . . . . . . . . . . . . . .

TRANSCRIPT OF

BOND REVOCATION HEARING

BEFORE THE HONORABLE PATRICIA S. HARRIS

UNITED STATES MAGISTRATE JUDGE

ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Colleen DuBose

Transcription Service:               Robin Warbritton
                                     Post Office Box 262
                                     Vilonia, AR  72173

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

APPEARANCES:

For the Government:          Ms. Stacy R. Williams
                            U.S. Attorney's Office
                            Eastern District of Arkansas
                            Post Office Box 1229
                            Little Rock, AR  72203-1229

For the Defendant:          Mr. Michael Kiel Kaiser
                            Lassiter & Cassinelli
                            300 South Spring Street
                            Suite 800
                            Little Rock, AR  72201

3

I N D E X

| | DIRECT | CROSS | REDIRECT | RECROSS | BY THE COURT |
|---|---|---|---|---|---|
| GOVERNMENT'S WITNESSES: | | | | | |
| Michael Umphenour (Recalled) | 6 | 11 | 22 | 24 | 21 54 |
| Jordan Riggs | 26 | 31 | | | 36 |
| DEFENDANT'S WITNESSES: | | | | | |
| Jordan Riggs | 40 | 41 | | | |
| Mujera Lungaho | 42 | 43 | | | |
| Fethullah Karademir | 49 | 52 | | | |

| EXHIBITS: | IDENTIFIED | ADMITTED |
|---|---|---|
| Exhibit A | 32 | 32 |
| Defendant's Exhibit | 48 | 48 |

4

1    P R O C E E D I N G S

2        (Call to order of the Court.)

3            THE COURT:  Can you hear me?  I know a few of you are

4    by phone only, but can you hear me if you're on the phone

5    only?

6            MR. KAISER:  Yes.

7            THE COURT:  Okay.  Mr. Lungaho, you're on silent.

8    Can you get off of --

9            THE DEFENDANT:  I can hear you.

10           THE COURT:  Okay.  Thank you.

11           Mr. Kaiser, can you see and hear me?

12           MR. KAISER:  Yes, ma'am.

13           THE COURT:  All right.  Mr. Riggs?

14           MR. RIGGS:  Yes, ma'am.

15           THE COURT:  Mr. Umphenour?

16           MR. UMPHENOUR:  Yes, ma'am.

17           THE COURT:  All right.  And Ms. Williams?

18           MS. WILLIAMS:  Yes, Your Honor.

19           THE COURT:  Okay.  Great.  We can get started then.

20           We are here for a bond revocation hearing.  The case

21   is *United States v. Benjamin Lungaho*, 4:20-CR-00288-DPM.

22           Stacy Williams is here for the United States.

23   Michael Kaiser is here as counsel for Mr. Lungaho.  They are

24   both participating by video-conference.  Mr. Lungaho is

25   participating by phone.  And Mr. Riggs and Mr. Umphenour are

1    here for Pretrial Services.  And I believe we have a witness

2    also on the phone.  Is that correct, Mr. Kaiser?

3              MR. KAISER:  Yes, ma'am.  Mr. Fethullah Karademir.

4    It's Mr. Lungaho's employer.

5              THE COURT:  Okay.  Very good.  Are the parties ready

6    to proceed?

7              MS. WILLIAMS:  Yes, Your Honor.

8              MR. KAISER:  Yes.

9              THE COURT:  Okay.  Mr. Kaiser, have you had an

10   opportunity to review the allegations of the petition seeking

11   to revoke?

12             MR. KAISER:  Yes, ma'am.

13             THE COURT:  And have you discussed those allegations

14   with your client?

15             MR. KAISER:  Yes, ma'am.

16             THE COURT:  What is your client's position with

17   regard to those allegations?

18             MR. KAISER:  Your Honor, that they are not true.

19             THE COURT:  Okay.  All right.  Then, Ms. Williams,

20   you may proceed with calling witnesses or whatever evidence

21   you wish to put on at this time.

22             MS. WILLIAMS:  Yes, Your Honor.  The United States

23   calls Michael Umphenour.

24             THE COURT:  Okay.  Mr. Umphenour, can you please

25   raise your right hand?  Do you swear to tell the truth, the

Umphenour - Direct                                    6

1   whole truth, and nothing but the truth, so help you God?

2          MR. UMPHENOUR:  I do.

3      (MICHAEL UMPHENOUR, GOVERNMENT'S WITNESS, SWORN.)

4          THE COURT:  Okay.  You may proceed.

5                    DIRECT EXAMINATION

6   BY MS. WILLIAMS:

7   Q   Officer Umphenour, how long have you supervised Mr.

8   Lungaho?

9   A   I have had -- supervised this case since 2020, since he

10  started supervision.

11  Q   And did you have a break in there because you had a child?

12  A   Yes, I was out of office from June 15th until Monday,

13  August 9th.

14  Q   Who supervised him while you were gone?

15  A   Officer Jordan Riggs.

16  Q   But you can review Officer Riggs's notes while you were

17  gone, right?

18  A   Yes.

19  Q   Let's just go through each of the allegations, because

20  he's denied all of them.  So, let's start with April 2nd and

21  9th of 2021.

22  A   Yes, ma'am.

23  Q   What happened?

24  A   Per the report I got from Recovery Centers of Arkansas, he

25  missed treatment sessions, individual counseling sessions, on

Umphenour - Direct                                    7

1   April 2nd and April 9th.  That was from the report I received

2   from them in terms of the written report they sent us.

3   Q   And on April 20th, June 28th, and July 8th, how did he

4   violate his conditions of bond?

5   A   He failed to report for substance abuse counseling (sic)

6   on those dates -- no, that's not -- sorry, I apologize.

7   Q   Okay.

8   A   My mistake.  My apologies.  I used the wrong word there.

9   It's testing.  My apologies.

10  Q   And so, where would he test -- where would he submit those

11  urine specimens?

12  A   At that point, our drug testing was happening over at

13  Recovery Centers of Arkansas, which would be just across the

14  river from us, at 1201 River Road, here in North Little Rock.

15  Q   And how did you find out that he did not report to those

16  tests?

17  A   Typically, the provider has a list -- they always have a

18  list.  And they send us a notice of anybody who misses.  And

19  then, it's sent over to our office and it's relayed to our --

20  to us officers and uploaded into our system.

21  Q   When is the last time that Mr. Lungaho tested for drugs?

22  A   The last drug test I have a record of is June 14th, 2021.

23  Q   Okay.  So, that's about two months ago, I guess?

24  A   Yeah.

25  Q   Okay.  Moving on to April 21st, May 4th, May 12th, and

Umphenour - Direct                                8

1  June 14th, what happened on those tests?

2  A   On those, the national lab, drug testing lab that we use,

3  confirmed that they were positive for marijuana.  I submitted

4  for an interpretation of results from our national lab, and I

5  still haven't received those back yet.

6  Q   And did the results conducted by Abbott Toxicology show

7  that it was new marijuana use?

8  A   It stated that determined each positive urine specimen to

9  be new use, not residual elimination.

10 Q   So, that means he was violating conditions on each of

11 those times, because he was smoking marijuana, right?

12 A   Yes.

13 Q   Okay.  Moving on to May 16th, what did he do on that date?

14 A   Per the report, he returned to his residence late, at 2:20

15 -- or 2:23 a.m., without approval of his supervising officer.

16 He was scheduled to return at 1:00 a.m.  This was a show

17 employment opportunity that he had provided to me and

18 validated that he had an opportunity for outside employment.

19 He was set to return at 1:00 a.m., and he didn't notify us

20 before returning late.

21 Q   And he came home at 2:30 in the morning -- around

22 2:30/2:23?

23 A   Yes.

24 Q   Okay.  On May 25th, what happened with his cell phone?

25 A   So, I -- when reviewing his phone log, I reached out to

1   our -- our phone provider and asked regarding an updated

2   little gap I saw for a couple of weeks, and they said that

3   there was -- appeared to be no activity.  And when I followed

4   up with Mr. Lungaho, he confirmed that he had switched phones.

5   And we didn't have that technology ported over to the new

6   phone yet.  I advised him several times to update me when he

7   does that so we can get it set up and get him switched over.

8   He stated I did not.

9   Q    And the reason it's important, why -- why is it important

10  for him to tell you that he got a new cell phone?

11  A    One of his conditions is to have his phone monitored for

12  any activity that would be inciting violence or anything

13  against the government.

14  Q    Okay.  And then, next, there are a lot of violations

15  regarding him coming in late.  And, I mean, let me just -- how

16  many are there?  Can you -- would you count them for the

17  Court?

18  A    There appears to be, on page 3 and 4, in total, 16

19  location monitoring violations listed.

20  Q    And sometimes, did he have excuses for those?

21  A    Yes.

22  Q    But did he always?

23  A    No.

24  Q    I want to look specifically at July 1st.  Could you tell

25  the Court what he did on that date?

1  A    Yes.  The Defendant went out of range at 2:10 a.m.,

2  without prior approval from his supervising officer, and

3  returned in range at 5:51 a.m.  The client, Mr. Lungaho,

4  advised that he went outside to smoke and take out the trash.

5  Q    Is that logical to think that it takes three hours to go

6  out and take the trash and smoke?

7           MR. KAISER:  Objection, Your Honor.  It's -- it's

8  leading.

9           THE COURT:  You can answer.  I'll overrule.

10          THE WITNESS:  If I was scheduling an outing to do

11 those two things, I would not schedule them for three hours.

12 BY MS. WILLIAMS:

13 Q    Okay.  Let's move on to July 10th.  What happened on July

14 10th?

15 A    Per the reports I received, that on July 9th, he left at

16 11:15 p.m., without approval from his officer.  And then, per

17 -- what was relayed to me was, "For work reasons."  And then

18 it was relayed that he was arrested around 4:00 a.m., on July

19 10th, by North Little Rock Police Department for public

20 intoxication; possession of a controlled substance, Schedule

21 6, less than four ounces; and drug paraphernalia.

22 Q    What was that controlled substance that he was in

23 possession of?

24 A    It's alleged to be marijuana.

25 Q    And is that the drug that he most normally fails drug

1  tests for, marijuana; is it marijuana?

2  A    Yeah.  Yes, every drug test on supervision that he has

3  been positive for has been marijuana.

4  Q    Should he have been home at 4:12 in the morning?

5  A    Yes, per my notes.

6  Q    And what hours are his office open?

7  A    The Avis Budget, from what I see online, and what I've

8  seen through, they're open 8:00 a.m. to 5:00 p.m., Monday

9  through Friday.

10 Q    Is there any reason he should have been late at -- or did

11 he give you a reason that he had to be out at 11:00 for work

12 on that day, or to Mr. -- Officer Riggs, I think?

13 A    I -- I would not have that right now.  I apologize.  I

14 believe Officer Riggs spoke with him about it.

15 Q    Okay.  Well, I can call him in a minute.  And -- okay.

16         MS. WILLIAMS:  I think I have no further questions

17 for this officer, Your Honor.

18         THE COURT:  Okay.  Mr. Kaiser, you may cross.

19                      CROSS EXAMINATION

20 BY MR. KAISER:

21 Q    Mr. Umphenour, I want to start with the April 2nd and

22 April 9th alleged missing RCA sessions.  All right?

23 A    Okay.

24 Q    Are you aware that he has attended numerous sessions since

25 that time?

1  A    Yes.

2  Q    And were you fully aware of where he physically was on

3  those dates, even though he didn't attend those sessions?

4  A    Per my records, yes.

5  Q    He was at work, right?

6  A    Per my records, yeah.

7  Q    Okay.  I want to talk about the April 20th, June 28th, and

8  July 8th failed to report for testing.  All right?

9  A    Yes.

10 Q    At what frequency was he doing testing at that time?

11 A    At that point, he would have been at what we call Phase 1,

12 which would be -- it fluctuates between probably two to four a

13 month; on average, three a month.

14 Q    Okay.  And then, again, you are aware of where he

15 physically was, even though he allegedly failed to report on

16 those dates?

17 A    Per his reports, he was either at work or at home, or

18 doing an approved activity, from what I have.

19 Q    But, I mean, aside from what he said, you have GPS status

20 showing he was at work?

21 A    At that point, he does not have GPS on.  He's wearing a

22 radiofrequency monitor, not a GPS.

23 Q    Excuse me.  You have radiofrequency data showing he's at

24 work, right?

25 A    So, the difference between -- so, GPS would show his

1  location.  Radiofrequency only shows when you're in range.

2  So, the thing on his ankle, when it's not in range of his

3  home, we're not able to monitor him once he's out of that

4  range.  He's -- we're then validating through impromptu home

5  visits or employment contacts when they're out.

6  Q   Okay.  I want to talk about the April 21st, May 4th, and

7  June 14th allegedly positive tests for marijuana.  All right?

8  A   Correct.

9  Q   I believe you testified there's been no confirmation on

10  those results; is that correct?

11  A   Per the report I have, I -- I do not have it.  It appears

12  that Officer Riggs -- you might want to ask if he had the

13  interpretation on that one.

14  Q   Okay.  And then, do you have those -- at least those

15  Abbott reports for the Court today?

16  A   I do.  I do have all four of the drug tests with the

17  confirmation and the results.

18  Q   Okay.  I want to move to the alleged May 16th violation.

19  You said he was scheduled to be home at 1:00 a.m., but didn't

20  arrive home until 2:23 a.m.; is that correct?

21  A   Correct.

22  Q   What day of the week was this?

23  A   I believe that was a Saturday.

24  Q   Would it surprise you that Saturday was the 15th, and

25  Sunday, in the early morning hours, was the 16th?

1  A   Okay.  Absolutely.  Yeah.  Saturday going into Sunday.
2  Correct.
3  Q   And you're aware that he had a -- kind of a moonlighting
4  work opportunity?
5  A   Yes, it was a unique opportunity for him.
6  Q   Okay.  And then, how would he get in contact with you at
7  1:00 a.m. on a Sunday?
8  A   My work phone.
9  Q   Okay.  You have no reason to believe he was anywhere other
10 than at that work event?
11 A   Correct.
12 Q   Okay.  I guess I want to talk about the coming in late
13 violations.  All right?
14 A   Yeah.
15 Q   Is he alleged to have engaged in, I believe you said,
16 violence against the government at all during any of these
17 times?
18 A   I show no record of that.
19 Q   Okay.  And in almost every case, you knew that he was at
20 work during these -- these times where he was ten or 12 or 30
21 minutes late?
22 A   Per the ones up until June 13th, yes.  After that, I do
23 not know exactly what was the -- the reason for each one.
24 Q   Is that -- is that because you weren't --
25 A   I no longer had -- yes.

1  Q   Okay.  I believe you testified he's working at Avis

2  employment.  Are you not aware of his new employment that he's

3  reported to your office?

4  A   We had discussed there was freelance work, but I never

5  received any verification on any new full-time employment.

6  There was some verification on some freelance, like side jobs

7  that he would do, and we'd submit schedules and try to work on

8  that when I was in the office up until June.  But, no, I don't

9  have any record of any new verified employment.

10 Q   Officer Umphenour, you're aware that Mr. Lungaho doesn't

11 have like a consistent personal motor vehicle?

12 A   Yes.

13 Q   And you're aware that he primarily relies on public

14 transportation and taxis?

15 A   Yes.

16 Q   Okay.  Would you agree a lot of these coming in late

17 violations tie back to employment and lack of transportation?

18 A   I would definitely agree transportation is a barrier, yes.

19 Q   Okay.  And then, you're familiar with his conditions of

20 release?

21 A   Yes.

22 Q   And so, one of the exceptions to his home detention is

23 work related?

24 A   Yes.

25 Q   And that would include driving to and from or getting to

1  and from work, right?

2  A    Yes.  And we would schedule that accordingly.

3  Q    Okay.  And then, are you familiar where he attends

4  religious worship?

5  A    Not off the top of my head, no.

6  Q    But it's --

7  A    I have it -- we have it on --

8  Q    Okay.

9  A    -- I know we -- he has gone to church, and we do have a

10 file, I just don't have the name of the church off the top of

11 my head.  I apologize.

12 Q    Yes, sir.  And is it true that one of the violations

13 listed in this report is that he -- his church service ran

14 late?

15 A    Per his report, he returned home late from the church

16 service.

17 Q    Okay.  And then, again, do you have any reason to believe

18 he wasn't at Holly Grove AME Church in North Little Rock

19 during that time?

20 A    No.

21 Q    Did you do anything to verify whether he was or not?

22 A    I would not know if he was physically at the church or

23 not.

24 Q    Right.  But did you or your office do anything to verify

25 that, calling a pastor, checking with other congregants,

1  anything?

2  A    I have no report of that.

3  Q    Okay.  And same question with the violations where he

4  allegedly was at work; did you call an employer?

5  A    I have no record of that either.

6  Q    I think you testified that sometimes you do impromptu home

7  or work visits.  Did you ever do that here to verify?

8  A    I did when he worked -- when he was working at Avis, yes,

9  I had seen him working at Avis in May and, I believe, early

10 June.

11 Q    Okay.  Are there any records of the violations in this

12 petition that your office attempted to verify with a -- with a

13 work visit?

14 A    Not that I have knowledge of.

15 Q    Even a call to the office?

16 A    Not that I have a record of.

17 Q    Okay.  To your knowledge, has he left the county at all

18 since we were last in court?

19 A    I have no report that he left the county.

20 Q    Okay.  You would agree there's no legitimate concern that

21 he's trying to run?

22 A    I've had no indication that he's running, but I don't know

23 whether he is or not.

24 Q    Okay.  You would agree he -- he doesn't even have a car,

25 were he to try to flee?

1  A   Well, he does live with his mother, and she has a vehicle.

2  Q   Okay.  You -- you would agree there has been no and there

3  are no allegations of violence or threats of violence in this

4  report?

5  A   Correct.  I see none.

6  Q   Okay.  And you have no indication that he's been violent

7  or threatened violence against anyone or property since our

8  last court appearance?

9  A   Yes, I have seen none.

10       MR. KAISER:  Your Honor, if I may just -- if I may

11  have one moment just to review my notes?

12       THE COURT:  You may.

13  BY MR. KAISER:

14  Q   Officer Umphenour, are you aware of where Mr. Lungaho is

15  right now, at this very moment?

16  A   Well, he stated he was in a car driving to work -- or

17  getting a ride to work.

18  Q   And, to your knowledge, is he almost exclusively at his

19  home, his place of employment, and his church?

20  A   Per our records, when he's not on a scheduled out, then

21  yes.

22  Q   And then, I think you testified he was arrested in a North

23  Little Rock case; is that correct?

24  A   Correct.

25  Q   And then, that case has not been resolved yet; is that

1  correct?

2  A    That's correct.

3  Q    And he's presumed innocent thus far?

4  A    Correct.  There's no -- there's been no plea and

5  arraignment or trial yet.

6  Q    Okay.  One last thing, what are the -- what are your --

7  what is your office's -- excuse me.  Let me rephrase.  How

8  does your office deal with people on release needing to call

9  in on weekends?

10  A    So, are you referring to location monitoring,

11  specifically?

12  Q    Yeah.  So, if I am scheduled to be at work until 6:00, but

13  my shift gets moved until 9:00, and it's a Sunday night --

14  A    Yeah.

15  Q    -- what is -- how do I contact that office?

16  A    Absolutely.  And at the start of supervision, when we have

17  somebody on location monitoring, everybody is read the

18  contract, and we let them review it, sign it, and we give them

19  a copy.  In there, it lists what to do during business hours

20  and then after hours.  And one of those, specifically, this

21  option, would be we have a duty line, a location monitoring

22  duty line, which is (501) 319-8000, that -- it's covered by an

23  officer on the weekend when it's reassigned on the weekends.

24  During the week, when I'm in office, it's covered by me,

25  Monday through Friday.  But, on weekends, it rotates.  But,

Umphenour - Cross                                    20

1   anybody who has any sort of emergencies, they are to call that

2   line and notify them.  Now, sometimes the call-in line --

3   let's say somebody is running late from work and they -- and

4   their schedule sticks, well, the officer can approve that, but

5   if, for example, they're on home incarceration and they can't

6   be moved, we don't have authority, but we take a note and then

7   relay that to the Court.  And, so, the duty -- the duty

8   officer is there specifically to help our clients, so that

9   they're -- when they're returning late, their car has a flat

10  tire, it breaks down, they've got to run to the hospital, that

11  we can be responsive and work with them.

12  Q    And is that how we have a lot of these reports from Mr.

13  Lungaho about running late for work and having transportation

14  issues in this very case in this petition?

15  A    Per the reports, it -- it appears that he didn't reach out

16  and contact us prior to being late is the issue.

17  Q    Right.  But that he dealt with a duty officer on weekends

18  for the majority of these violations?

19  A    Yes, anything that occurred on the weekend would be with

20  the duty officer.

21  Q    Okay.  And you would agree the vast majority of these

22  location violations are on the weekends, out of normal

23  business hours?

24  A    I would say they do occur on the weekend, yeah.

25          MR. KAISER:  I would tender the witness, Your Honor.

1        THE COURT:  Okay.  Ms. Williams, I would like to ask

2   a few questions.  And then I'll let you guys follow up on

3   those with your redirect and to the extent that I raise any

4   questions.

5   BY THE COURT:

6   Q   I want to make sure I understood the testimony that you

7   just stated, Mr. Umphenour.  Did you say that -- that Mr.

8   Lungaho did call the duty line when he was going to be late,

9   or he didn't?  I was not clear on that.

10  A   Per the records, I don't see that he -- he did not call

11  the duty line before returning late.

12  Q   Okay.  Were there any instances in which the records shows

13  that he did call the duty line to notify that he would be

14  late?

15  A   For these violations, I saw no record of that.

16  Q   Okay.  Okay.  And if he had called the duty line, could

17  the officer on duty have agreed or found that that was not a

18  violation then, or that it was okay for him to be late,

19  because he called?

20  A   Yes, they can adjust the schedule, and extend it out, to

21  give them more time to travel or whatever emergency popped up

22  -- pops up at that time.

23  Q   Okay.  Okay.  Also, there was some reference to side jobs

24  or jobs at night.  Do you know what that's referring to?

25  A   The first time we spoke about it, it was literally the end

1   of May, early June.  And he was requesting to do -- it's

2   through an app, it's a jobs app, and so you find -- basically,

3   people in the community would post jobs, like small, short

4   term jobs that they want done.  And if he would tell me the

5   address, what he was doing, where it was going to be, because

6   Mr. Lungaho is -- has some talents as a handyman, some

7   gardening skills, and so, if he submitted that to me, could

8   verify where he was, and do that sort of stuff, then -- and

9   verify that he was getting paid, then I would work with him to

10  allow him to -- to get out and gain this extra employment.

11  Q   Were there any of these instances where he was outside of

12  the home on a side job that he had not notified you about?

13  A   Not that I have a record of, no, ma'am.

14  Q   Okay.  Okay.  And then, do you know what his new

15  employment is?

16  A   I do not, Your Honor.

17  Q   Okay.

18          THE COURT:  All right.  That's all I have.  And you

19  guys feel free to follow up.  Ms. Williams?

20          MS. WILLIAMS:  Yes, Your Honor.  I do have a few

21  questions.

22                      REDIRECT EXAMINATION

23  BY MS. WILLIAMS:

24  Q   So, even the odd jobs, would it be at 1:00 a.m., Officer

25  --

1  A    The only --

2  Q    -- Umphenour?  Go ahead.

3  A    The only job that I know for sure that was at 1:00 a.m.

4  was the job that was approved at the Comedy Store, where he

5  was allowed to work.  That was the one on, I believe it's July

6  -- not July 1st -- I apologize.  I don't have the -- I can't

7  remember which date it was.  It was May 16th, was the one that

8  was -- May 16th, 2021, was the one that was approved for 1:00

9  a.m.

10 Q    Okay.

11 A    Anything outside of that, I have no record of him being

12 approved to work at that time.

13 Q    Okay.  And what -- what hours is he supposed to be home on

14 an average day?

15 A    Typically -- (indiscernible, recording buffering) -- I

16 apologize for that.  Typically, on the schedule, it would be

17 probably 8:00 to 9:00, depending on if he's traveling via a

18 car, he's using a Uber, or he's taking a bus.  So, it'd vary.

19 Every week, our clients are directed to submit schedules with

20 what time they're planning to leave their house and what time

21 they plan to be home.  And then, we enter the schedule for

22 that week.

23 Q    And every --

24 A    And so, Officer --

25 Q    Oh, sorry.

Umphenour - Redirect/Recross                    24

1   A   Oh, you're fine.  Officer Riggs has been helping me enter

2   those schedules for the last six weeks, so I'm not a hundred

3   percent certain on what his schedule has been the last six

4   weeks.

5   Q   But, every violation is without the -- is outside of that

6   schedule that he submitted to you; is that correct?

7   A   Yes.

8   Q   Okay.

9        MS. WILLIAMS:  Okay.  Your Honor, no further

10  questions for this witness.

11        THE COURT:  Okay.  Mr. Kaiser, do you have any follow

12  up?

13        MR. KAISER:  Yes.

14                     RECROSS EXAMINATION

15  BY MR. KAISER:

16  Q   How many duty officers are on at any moment?

17  A   On the weekend?

18  Q   Yes.

19  A   So, there is a -- what we have on the weekend, it starts

20  Friday at 5:00 p.m., until Monday at 8:00 a.m., unless it's a

21  holiday, it goes a little longer.  We have one officer as the

22  primary, and that duty phone goes to that primary officer.

23  And they're responsible for the phone on weekends, they're

24  responsible for alerts.  So, we have location monitoring

25  alerts for the whole district.  That officer is responsible.

Umphenour - Recross                                    25

1  To help with alerts though, we have a backup officer that

2  helps strictly with alerts, and then a supervisor as well

3  that's in the rotation.  And it goes in circle.  The duty

4  phone is only covered by one officer, and it goes directly to

5  their phone.

6  Q    Okay.  And is a record automatically generated when

7  someone on supervision calls a duty officer, or does the duty

8  officer have to affirmatively enter a record?

9  A    They have to enter it.

10 Q    Okay.  And so, whether that's at 5:01 p.m. or 3:00 a.m.,

11 they would have to enter it?

12 A    They would have to enter a note of the phone call.  The

13 alerts are auto-generated.  The alert, requiring -- somebody

14 doesn't enter or leave or returns late, those are generated by

15 the system and happen 24/7.  The phone call, yeah, would have

16 to be entered by the officer.

17 Q    And then, do the Pretrial Release Officers have access to

18 your internal system, supervision system, outside of your

19 place of employment?

20 A    Yes.

21           MR. KAISER:  I tender the witness.

22           THE COURT:  Okay.  Mr. Umphenour, that will conclude

23 your testimony.

24           And, Ms. Williams, you may call your next witness.

25           MS. WILLIAMS:  The United States calls Officer Riggs.

1   THE COURT:  Okay.  Officer Riggs, I need to swear you

2   in.  Can you raise your right hand?  Do you swear to tell the

3   truth, the whole truth, and nothing but the truth, so help you

4   God?

5   MR. RIGGS:  I do.

6   (JORDAN RIGGS, GOVERNMENT'S WITNESS, SWORN.)

7   THE COURT:  All right.  You may proceed.

8                        DIRECT EXAMINATION

9   BY MS. WILLIAMS:

10  Q   Officer Riggs, I can't see you.  Is your video on?

11  THE COURT:  Yeah, it is.

12  THE WITNESS:  It's on.

13  BY MS. WILLIAMS:

14  Q   Oh, okay.  It's weird because I can't look at you, but,

15  so, you -- you heard all of the testimony from Officer

16  Umphenour, right?

17  A   Yes.

18  Q   Can you fill in any of the blanks of when he was on leave

19  about Mr. Lungaho calling in and being late when he was

20  supposed to report hours earlier or sometimes minutes earlier?

21  A   Sure.  I had a few conversations with Mr. Lungaho when I

22  first got him.  He would be late and not call and -- or text

23  me, and I would just say, you know, I called him, "Hey, if you

24  need extended time, call me, text me, and I'll extend it for,

25  you know, travel purposes or something."  And then, he did get

1  better about doing that.  And so, I've received multiple, you

2  know, text messages from, you know, June 15th -- or having

3  those conversations up until last week, you know, which he

4  would request more time and I would grant it to him, you know,

5  whether he was waiting on a ride, or having to walk, or

6  something along that lines.  They -- the only issue there ever

7  was for me with him is that he would not call and ask.  It

8  would be after the fact, that we'd have to call him.

9  Q    Well, can you give some clarity about the marijuana tests?

10 A    Yes.

11 Q    I'm a little confused.

12 A    I have -- I requested interpretation of results from

13 Abbott Laboratories, they're our national lab, on his dates.

14 I can read the -- read the interpretation results or I can

15 just summarize what it says.  What would you prefer?

16 Q    You can just summarize them.

17 A    So, basically, they have a couple of different methods of

18 testing to ensure it's -- they use gas chromatography and mass

19 spectrometry and liquid chromatography and mass spectro

20 -- sorry -- spectroscopy.  I'm not a toxicologist or any type

21 of -- I don't have any type of chemistry degree or anything

22 like that, so I'm just reporting what it says on here.  So,

23 they use that to measure the levels of the drug in the urine,

24 and they also cross-reference that against what's called

25 creatinine.  Creatinine is a metabolite of a salt that the

1  body produces naturally, and so they measure the creatinine to

2  determine whether or not a urine sample is valid.  A valid

3  urine sample has, I believe, 20 nanograms per millimeter and

4  above of creatinine in it.  And so, they'll look at that.

5  It'll be like 20 to I think it's like 150 or 200.  That's --

6  that's just -- that's part a guess, but the minimum is 29, and

7  start is 20.  And so, what they do is, they'll look at the --

8  the level of the -- the alleged drug in the urine sample, and

9  then they'll cross-reference that to the creatinine level, and

10  then they'll use a table chart to determine, based on how much

11  drug level there is reported in the urine, how much creatinine

12  level there is in the urine, and then they -- they use a chart

13  based on metabolites of -- the metabolism, say, of marijuana,

14  determine how -- how much should be in his system after a

15  certain period of time.  And does that -- does that make

16  sense?

17  Q   Yes, I believe so.  But each of these tests -- each of

18  these positives are confirmed; is that what you're saying?

19  A   Yes.

20  Q   And they have been confirmed to be new use?

21  A   Yes.

22  Q   Okay.

23  A   Based on that criteria.  And that's a rough explanation on

24  that.  Again, I'm not a chemist or a toxicologist.

25  Q   But that was helpful.  Thank you.  Also, let's move on to

1  the date that Mr. Lungaho was arrested.

2  A    Uh-huh.

3  Q    Was there any reason for him to be out at 4:00 a.m.?

4  A    Not at 4:00 a.m.  He did text me that day.  And let me --

5  if it's all right, I'll look at my text messages from him.

6  Q    Yes, please.

7  A    So, on, I believe it was July 9th, he -- he sent me a text

8  message at 7:13 p.m., he said, "I'll be working late tonight.

9  I was asked to close.  I'll be home by 11:00."  I responded,

10 "Approved."  And then, he texted me again at 10:47 p.m.,

11 stating, "Waiting on my ride.  Should be home by 12:30."  I

12 did not respond to that text message because I was asleep at

13 that time.  Should have -- both texts should have went to the

14 duty officer, but I had my phone on me when he had texted me

15 earlier and I went ahead and approved it and extended his

16 schedule to 11:00.

17 Q    So, he was supposed to be home at 11:00, or then 12:30?

18 A    If he -- yeah, if he would have gotten approval from the

19 duty officer, yes.

20 Q    What work was he supposed to be doing?

21 A    He didn't say.  I was -- assumed that he was working for

22 Avis, but that was what he had reported on his prior schedule

23 to me, is that he worked for Avis, Monday through Friday

24 typically.  And then, he didn't -- didn't say anything beyond

25 that.

1  Q   But, doesn't Avis close at 5:00 p.m.?

2  A   I didn't know that at the time, but according to the

3  information provided by Michael Umphenour, yeah.

4  Q   And have you reviewed the police report from that night?

5  A   Yes.

6  Q   Did -- I know that he is innocent until proven guilty, but

7  was he very intoxicated?

8  A   According to the report, he had the odor of intoxicants --

9  intoxicants emanating from him; he had red, watery, bloodshot

10  eyes and slurred speech.  The officer also noted that Mr.

11  Lungaho appeared to have urinated on himself and was unsteady

12  on his feet.

13  Q   And the officer searched him, and what did he find?

14  A   He found a small Tupperware container with a green leafy

15  substance.  The officer noted in the report, through his

16  training and experience, he believed the substance to be

17  marijuana.  He also found a small metal pipe that was colored

18  to resemble a cigarette and was also located in his front

19  pocket.

20  Q   Did you talk to Mr. Lungaho after that, after his arrest?

21  A   Yeah.  I talked to him, I believe, on the 12th, I think --

22  let me look at my notes real quick.  I did not speak to him

23  until -- I'm sorry -- until July 18th.

24  Q   And what did he say?

25  A   He admitted that he was taken into custody, but denied any

                        Riggs - Direct/Cross                    31

1    -- he denied possession of any -- anything, and denied alcohol

2    use, I believe.

3    Q   When -- and when is the last time he tested -- had a

4    urinalysis?

5    A   Let's see here, the last -- the last collected urinalysis

6    was on June 14th.

7    Q   If we would have been in person today, would he have been

8    tested today?

9    A   Yes.

10          MS. WILLIAMS:  No further questions, Your Honor.

11          THE COURT:  All right.  Thank you.

12          Mr. Kaiser?  You're on silent.

13          MR. KAISER:  Thank you.

14                        CROSS EXAMINATION

15   BY MR. KAISER:

16   Q   Officer, you said you had those confirmation reports.  It

17   looked like you were looking at them in front of you?

18   A   Yes.

19          MR. KAISER:  Well, I would just ask that those be

20   admitted so the Court can confirm.  I don't doubt his

21   testimony, but, you know, I think we should see the numbers,

22   if that's all right with -- with you.

23          THE COURT:  That's okay with me.  Is there any

24   objection, Ms. Williams, on your part?

25          MS. WILLIAMS:  No, Your Honor.  I would have admitted

1  them if we would have been there.

2              THE COURT:  Okay.  Well, what I'll do is ask Mr.

3  Riggs to email me or deliver to me a copy of those reports,

4  and we'll mark those as Exhibit A, and I will review them.

5         (Exhibit A identified and admitted.)

6              MR. KAISER:  Yes, ma'am.

7  BY MR. KAISER:

8  Q   Officer, you testified that on July 9th, you were unable

9  to verify, or not, his request -- or approve his request to

10 come home a little late because you were asleep; is that

11 right?

12 A   I approved his first request to report -- to come home at

13 11:00, yes.

14 Q   But then, you were asleep?

15 A   But then, there was a second one, yes, that I did not

16 approve.

17 Q   And so, I mean, you're a human being, you've got to sleep

18 your solid eight, right?

19 A   Sure.

20 Q   Okay.  And so, you know, does this -- does this happen

21 commonly that you get a request that is made at a time when

22 you are incapacitated by being asleep?

23 A   During the week, typically, no.  I keep my phone next to

24 me, have -- have, you know, the volume on, so if there's

25 something that comes up, I can, you know, respond to anybody

1  who is on -- on LM or location monitoring.  On Fridays,

2  usually, in the evenings, when I'm not on-call or on duty, I

3  will either turn my phone off or leave it on the -- or in the

4  other room.

5  Q   Okay.  And then, I believe you were covering this case for

6  your fellow officer Umphenour, due to, you know, the joy in

7  his life, having a child; is that right?

8  A   Yes.

9  Q   Were you specifically assigned or were you doing this as

10 kind of, you know, helping out a coworker?

11 A   I was specifically assigned this case for that period of

12 time.

13 Q   Okay.  How many other -- how many people are you the

14 primary Pretrial Supervision Officer for?

15 A   Oh, I have a caseload.  Give me just a second and I'll

16 tell you.  I have post-conviction cases as well.  I'll give

17 you both numbers.

18 Q   Thanks.

19 A   So, right now, I have 14 active post-conviction cases and

20 seven active pretrial cases.  During that time, I believe I

21 had received 11 cases total from Officer Umphenour to

22 supervise.

23 Q   Okay.  And so, I mean, did that put a strain on your

24 ability to cover all of your cases, adding 50 percent?

25 A   Are you asking if it was more difficult --

1   Q   Yes.

2   A   -- to supervise more cases?  Yeah, it's more difficult to

3   supervise more cases.

4   Q   Have you ever had that many cases at a single time?

5   A   I've had more.  Right now, I'm the drug and alcohol

6   treatment specialist, so, typically, I carry a half caseload,

7   and then I oversee our contracting for our vendors and our

8   drug testing for our district, so I carry a half caseload.

9   But when I am not -- when you're not in a specialist spot, you

10  carry a full caseload, which is larger than that.

11  Q   Okay.  But you wear a lot of hats?

12  A   Yes, sir.

13  Q   Okay.  And this was a -- you went from 21 to 32 for a

14  period of a few months?

15  A   Yes, sir.

16  Q   In addition to those additional duties?

17  A   Yes, sir.

18  Q   Okay.  And I believe you testified you didn't visit with

19  Mr. Lungaho regarding his July 10th arrest until July 18th; is

20  that correct?

21  A   Yes.

22  Q   Was that delay due to the additional strain of having

23  those 11 cases from Officer Umphenour?

24  A   No, I had attempted to call Mr. Lungho -- Lungaho, I'm

25  sorry, give me just a second, on -- let me scroll through my

1  notes.  On July 12th, at 1:56, I attempted to call Mr.

2  Lungaho.  He did not answer.  And I sent him a text message

3  directing him to call me.  And I did not receive a response

4  from him.  And I didn't make another attempt to contact him

5  until I met with him at his house on July 18th.

6  Q    And then, I want to discuss with you the 16 alleged

7  location coming in late violations.  All right?

8  A    Yeah.

9  Q    For any of those, did you go to his home or place of

10 employment to verify?

11 A    No, sir.

12 Q    Okay.  For any of those, did you call anyone at his home

13 or place of employment, other than himself?

14 A    No, sir.

15 Q    And then, the records show -- or you're aware of where he

16 attends church; is that right?

17 A    Again, I don't have it on me, but he has reported it to

18 me, he has provided that information.

19 Q    Okay.  And so, you -- but you didn't call anyone at the

20 church?

21 A    No, sir.

22 Q    Okay.  And then, you know where he's working?

23 A    If it's at Avis Rentals, yes.  Yes, sir.

24 Q    And you don't call anyone there to verify either?

25 A    I have not, sir.

Riggs - Cross                                          36

1    Q    Okay.

2              MR. KAISER:  If I may have just one moment?

3              THE COURT:  You may.

4              MR. KAISER:  Thank you.

5    BY MR. KAISER:

6    Q    Officer Riggs, during the time you supervised him, did you

7    -- is it true you had no information of any threats of

8    violence or actual violence by my client?

9    A    There is no -- no indication.  I've not received any

10   indication that he's threatened anybody or committed any acts

11   of violence.

12   Q    And do you have any indication that he's even left the

13   county at all since we were last in court?

14   A    I have no indication that he's left the county.

15   Q    And do you have any indication that he's plotting a big

16   escape out of this district?

17   A    I have no indication or any of that information.

18   Q    Okay.

19             MR. KAISER:  I would tender the witness at this time.

20             THE COURT:  Okay.

21   BY THE COURT:

22   Q    Mr. Riggs, I have one quick question for you.  How did you

23   find out about Mr. Lungaho's arrest?

24   A    Well, initially, there was a alert sent to me by, I

25   believe, the duty officer, saying that he didn't report as

1  directed -- or return home that night.  And then, I believe

2  Officer Umphenour received what we call Atlas hits, it's the

3  police contact, and he forwarded that information to me,

4  indicating that Mr. Lungaho had police contact within -- in

5  North Little Rock, with North Little Rock Police Department.

6  And then, I followed up on the information.  That would have

7  been -- I received that on Saturday.  I would have followed up

8  on that Monday.

9  Q   Did you say that he -- that Mr. Lungaho made contact with

10 the duty officer and reported his arrest?  Is that what you

11 said?

12 A   Give me just a second.  Sorry, Your Honor.

13 Q   Yeah.  I'm trying to figure out if he reported the -- his

14 arrest, or if you learned about it by another means.

15 A   I don't have any information that he did call or did not

16 call the duty officer advising that he was arrested.  The duty

17 -- the duty officer did speak to him on July 11th in reference

18 to -- let's see here -- no, he, on July 11th, at 2059, 8:59

19 p.m., the duty officer spoke to him about he -- I believe he

20 hadn't returned home in time, and he had reported that he was

21 at a -- doing work for a charity event, but I don't see any

22 reflection discussing an arrest.

23        THE COURT:  Okay.

24        Okay.  Ms. Williams, if you have any follow up, you

25 may.

1          MS. WILLIAMS:  No follow up, Your Honor.

2          THE COURT:  Mr. Kaiser, do you have any follow up?

3    You're on -- you're on silent.

4          MR. KAISER:  Yes, Your Honor.

5          THE COURT:  Okay.

6          MR. KAISER:  No, Your Honor.

7          THE COURT:  Okay.  Thank you, Mr. Riggs.

8          THE WITNESS:  Thank you, Your Honor.

9          THE COURT:  Ms. Williams, do you have any additional

10   testimony or evidence you wish to offer at this time?

11         MS. WILLIAMS:  No more evidence, Your Honor.

12         THE COURT:  Okay.  Thank you.

13         Mr. Kaiser, do you wish to offer any evidence or

14   testimony?

15         MR. KAISER:  Your Honor, is there a way that I may

16   confer with my client briefly regarding the specter of

17   testifying?  If we were in court, I would lean over and

18   whisper in his ear.  If it's all right, may I give him a call

19   on the -- on my cell phone, rather than -- I don't know if we

20   could do a break out for everyone, or that would just take

21   forever.

22         THE COURT:  I don't know if we can -- we could set

23   that up, but I -- frankly, I'm not sure I know how to do that.

24         MR. KAISER:  Okay.

25         THE COURT:  But, I have no problem if you want to

1   give him a call, but we may lose him.  I don't know.  Go ahead

2   and do that and put yourself on silent so we can't hear you.

3   Okay?

4           MR. KAISER:  Yes, ma'am.  Should be very brief.

5           THE COURT:  Okay.

6           MR. KAISER:  Thank you.

7           THE COURT:  Uh-huh.

8       (Mr. Kaiser confers with his client, off the record.)

9           MS. WILLIAMS:  Your Honor?

10          THE COURT:  Yes.

11          MS. WILLIAMS:  Can I run to the restroom?

12          THE COURT:  Of course.

13          MS. WILLIAMS:  Okay.  I'll be right back.

14          THE COURT:  Okay.

15          MR. KAISER:  Judge, I'm ready when you are.  I think

16  --

17          THE COURT:  Okay.

18          MR. KAISER:  -- I think Mujera is back.  He just was

19  placed on hold.

20          THE COURT:  Okay.  Do you wish to call any witnesses?

21          MR. KAISER:  Yes.  I call Jordan Riggs.

22          THE COURT:  Okay.  Mr. Riggs, you are still under

23  oath.

24          And, Mr. Kaiser, you may proceed.

25      (JORDAN RIGGS, DEFENDANT'S WITNESS, PREVIOUSLY SWORN.)

1                         DIRECT EXAMINATION

2    BY MR. KAISER:

3    Q   Mr. Riggs, to your understanding, where is my client

4    working?

5    A   The last information I received was on Avis, that he was

6    working at Avis.

7    Q   Okay.  And then, has he changed his schedule in the last

8    month or month and a half?

9    A   Not that he's -- he's not sent me a sheet.  What Officer

10   Umphenour was talking about earlier, they provide a -- an LM

11   schedule sheet when they make changes.  The last one I

12   received from him was on June 24th.

13   Q   And what were the hours for that upcoming week?

14   A   So, it was -- so, Monday, Tuesday, Wednesday, Thursday,

15   Friday, it states 8:30 to 9:30 p.m., work, Avis at Budget and

16   at McCain Mall.  That's the last one I received from him.

17   Q   And it's your testimony you've never received any phone

18   calls from him about switching employment?

19   A   I don't recall him switching employment, and I haven't

20   received a new schedule from him, indicating places.

21   Q   Okay.  But have you received a request for a different

22   schedule than the 9:00 to 5:00 hours we heard regarding Avis

23   earlier?

24   A   Not the -- not a written request.  I have adjusted his

25   schedule as -- as he's texted or as he's called, but those are

Riggs - Direct/Cross                                41

1  like one time adjustments, not like a permanent change.

2  Q   Is it true that he's been working 11:00 to 8:00 shifts

3  lately?

4  A   Let me see.  I haven't received any information on that.

5  Q   Is your phone number (501) 539-5586?

6  A   It's (501) 515-07534 -- 75 -- let me -- sorry.  It is

7  (501) 515-7534.

8  Q   Do you know if 539-55 -- 5886 is one of the duty numbers?

9  A   I don't know what it is.

10 Q   Okay.

11         MR. KAISER:  Nothing further.

12         THE COURT:  Any questions, Ms. Williams?  You're on

13 silent.

14         MS. WILLIAMS:  Thank you.

15                      CROSS EXAMINATION

16 BY MS. WILLIAMS:

17 Q   Is it Mr. Lungaho's responsibility to notify his

18 supervising officer if he changes his job?

19 A   Yes.

20         MS. WILLIAMS:  No further questions, Your Honor.

21         THE COURT:  Okay.  Thank you.

22         Mr. Kaiser, do you wish to offer any additional

23 testimony or exhibits?

24         MR. KAISER:  Yes.  I'd call Mujera Lungaho.

25         THE COURT:  Okay.  Mr. Lungaho, I need you to raise

Lungaho - Direct                                                  42

1   your right hand.  I can't see you, but I need you to affirm

2   that you have raised your right hand.  You're on silent right

3   now, so you'll need to take that off.  Okay.  There you are.

4   Mr. -- you are still on silent.  Can you take your -- there

5   you go.  Do you swear to tell the truth, the whole truth, and

6   nothing but the truth, so help you God?

7           MR. LUNGAHO:  Yes.

8       (MUJERA LUNGAHO, DEFENDANT HEREIN, DEFENDANT'S WITNESS,

9   SWORN.)

10          THE COURT:  Okay.  Very good.  Mr. Kaiser, you may

11  proceed.

12                      DIRECT EXAMINATION

13  BY MR. KAISER:

14  Q   Mr. Lungaho, you've heard the testimony today regarding

15  the location violations related to your employment?

16  A   Yes.

17  Q   And can you discuss your attempts to make contact with the

18  duty officer on weekends?

19  A   Yes.  As Officer Umphenour stated earlier, he did give me

20  the 319 -- the (501) 319 emergency duty number for weekends

21  and like nighttime.  So, what I would do, because they did

22  have to have a couple of conversations with me, like they

23  said, but, after a point, I would call those numbers, I would

24  not get a -- like an answer.  Sometimes, I guess it would be

25  forwarded to a duty officer.  Most recently, I got a call from

Lungaho - Direct/Cross                                             43

1    a duty officer because there was a violation via location

2    monitoring after I had contacted the duty number to let them

3    know.  It was the time that I went to do the charity event the

4    second time.  I called them, no response, no nothing.  Then,

5    when the location monitoring sent the alert, then the duty

6    officer called me.  So, when I was calling those 319 -- that

7    319 number, I don't know what's happening.  Maybe it was like

8    a -- because I think at that time it was -- the call, it was

9    being forwarded to -- the number it was being forwarded to was

10   not the duty officer that I was supposed to be contacting that

11   weekend, so she never got my contact when I called that 319

12   number.  And then, when the location monitoring came in,

13   that's when she was alerted.  And so, I had to fill her in

14   then.  So, me contacting her in advance, it didn't work.

15   Q    In the majority of these alleged location violations for

16   being late from work, did you attempt to make contact with the

17   duty officer or any officer?

18   A    Yes.

19            MR. KAISER:  I tender the witness.

20            THE COURT:  Ms. Williams?

21            MS. WILLIAMS:  Yes, Your Honor.

22                        CROSS EXAMINATION

23   BY MS. WILLIAMS:

24   Q    So, Mr. Lungaho, if you didn't receive confirmation that

25   you could be late, you would still do it anyway, right?

1    A    Well, because there was the work restriction for my

2    detention -- home detention.

3    Q    Yes, but no one gave you permission to be late, but you

4    did it anyway?

5    A    No.  No.  No.  I'm not talking about being late.  I'm

6    talking about scheduling work at all.  Like, so if I was

7    called in, and they -- like somebody called -- like for the

8    charity event, I was called that day, and said, "Hey, I need

9    you to work the door."  So, at around 3:00 -- 3:00 p.m. that

10   afternoon, I was calling the duty officer to let them know

11   that I was called into work around 7:00, and never got a

12   response.

13   Q    But you did it anyway?

14   A    Yeah, because I -- I need to work, yes.

15   Q    But you understand that's a violation of your conditions

16   of release unless you have permission?

17   A    I did not understand that if I was working that it would

18   be a violation, no.

19   Q    How many times have you failed urinalyses for marijuana

20   during your supervised release -- or your pretrial release?

21             MR. KAISER:  I'd object to that, Your Honor.  It's

22   outside the scope and it's in the record already.  It's

23   cumulative as well.

24             THE COURT:  I'll allow it.

25             THE WITNESS:  I do not recall.  I've never been like

Lungaho - Cross                                                45

1  given notification when I go do the testing.

2  BY MS. WILLIAMS:

3  Q   Do you deny use?

4  A   I have used before, but I --

5          MR. KAISER:  I'm objecting again, it's outside the

6  scope, completely outside the scope.

7          MS. WILLIAMS:  Your Honor, it goes to his

8  credibility, Your Honor.  You have the positive tests, if --

9          THE COURT:  I'll allow it.

10          THE WITNESS:  I started using a medication after

11  seeing a psychiatrist, that was court appointed, with the same

12  drug treatment.  And so, since then, no, I have not.

13  BY MS. WILLIAMS:

14  Q   When is the last time you took a drug test?

15  A   I believe in June.

16  Q   Have you been -- have you received Code-A-Phone to give

17  another one?

18  A   Yes, I haven't had an opportunity to be able to make it

19  because of my work scheduling.  I've literally been in the

20  store seven days a week for the last like two or three weeks.

21  Q   What store?

22  A   The Fix.  I actually gave notification to my PO, or Jordan

23  Riggs at the time, via phone call about my new employment.

24  Q   But you haven't submitted a schedule, right?

25  A   I have submitted a schedule.  Actually, Mr. Riggs asked me

1  about the new scheduling criteria, and he submitted it in a
2  way where he said, "Well, do you want me to just put it in for
3  the weeks leading up, that way you don't have to submit it
4  anymore?"  That's the reason why he hasn't gotten a schedule
5  from me, because once we had that conversation, he set it in
6  stone, and it's like that now for -- for each week.
7  Q    I'm confused.  So, what is -- what are your hours now?
8  A    So, I leave home at 8:30 and make it home by 9:30, because
9  I'm pretty much opening and closing this store here, from
10  about 11:00 to 10:00.  It depends on the day of the week.  So,
11  normally, 11:00.  It takes me a couple of hours to get here,
12  when I'm riding the bus or something like that.  And then, on
13  weekends, it's from 10:00 until about eight o'clock.
14  Q    When did you start working at I Fix?
15  A    A few months ago -- a couple of months ago.
16  Q    Were you working there --
17  A    About the time that -- what was your question?
18  Q    Around the time what?  What were you saying?
19  A    About the time when Mr. Riggs and Mr. Umphenour switched
20  their supervising.
21  Q    Were you working there on July 10th?
22  A    I believe so, yes.
23  Q    When you texted Officer Riggs to ask to work late, why --
24  why did you need to work until 12:30?
25  A    Because I was having to clean up around here.  I had a lot

1    of extra stuff to do.  And then, I actually was waiting on a

2    cab once I got finished.  And so, there will be times where

3    I'll call a cab driver, and I'm sitting here waiting for like

4    a hour or two.  It's happened a few times, where I've had to

5    let them know, like, "Hey, man, I'm just sitting here."  I've

6    even let the duty officer know, "I'm really just sitting here

7    waiting on the -- the cab to come and I don't know like what

8    time they'll be here, but when they get here, I'll let you

9    know."  And I -- and I've done so when they did, or I've let

10   them know when I've gotten home when I did.

11   Q   Why were you at Springhill Baptist at 4:00 a.m.?

12   A   I do not recall.

13          MS. WILLIAMS:  No further questions, Your Honor.

14          THE COURT:  Mr. Kaiser?

15          MR. KAISER:  Nothing further.

16          THE COURT:  Okay.  That's -- that will conclude your

17   testimony, Mr. Lungaho.

18          Any other witness testimony or evidence, Mr. Kaiser?

19          MR. KAISER:  Yes, Your Honor.  I would call Fethullah

20   -- I'm pulling it up -- Kar -- Karademir.

21          THE COURT:  Okay.

22          MR. KAISER:  I apologize, it looks like he -- he

23   slipped off the call.

24          THE COURT:  Yeah.  I don't see that he's on the call.

25   Do you want to reach out to him?

1          MR. KAISER:  Yes, ma'am.  He may have gotten a little

2   weary of hearing -- hearing me speak.  Just one moment.

3          THE COURT:  Sure.

4          MR. KAISER:  Your Honor, he should be on momentarily.

5          THE COURT:  Okay.

6          MR. KAISER:  I do have one exhibit I would like to

7   submit to the Court.  I can do so by email.  It's a text

8   message from my client to the duty officer phone number, dated

9   -- oh, it's not dated.  I'm going to ask my client to send me

10  a dated version.

11         THE COURT:  Okay.

12         MR. KAISER:  But showing him working at The Fix,

13  specifically, with the sign, noting that he has to catch a cab

14  based on the -- the closing hours of the shop.

15         THE COURT:  Very good.

16     (Defendant's Exhibit identified and admitted.)

17         MR. KAISER:  And then I will call Mr. Karademir as

18  soon as he's -- as he's on.

19         THE COURT:  I believe he is on.

20         MR. KARADEMIR:  Hello.

21         MR. KAISER:  Hey there, Mr. Karademir.  This is

22  Michael Kaiser.  Can you hear me?

23         MR. KARADEMIR:  Yes.

24         MR. KAISER:  Okay.  I think the judge is going to

25  have you just take an oath real quick.

1          MR. KARADEMIR:  Yes.  Hello.

2          THE COURT:  Can you raise your right hand, please?

3          MR. KARADEMIR:  Yes.

4          THE COURT:  Do you swear to tell the truth, the whole

5    truth, and nothing but the truth, so help you God?

6          MR. KARADEMIR:  Yes, I do.

7          THE COURT:  Okay.  Thank you.

8          MR. KARADEMIR:  You're welcome.

9      (FETHULLAH KARADEMIR, DEFENDANT'S WITNESS, SWORN.)

10                    DIRECT EXAMINATION

11   BY MR. KAISER:

12   Q    Mr. Karademir, will you please state your name?

13   A    Hello?

14   Q    Hey, will you please state your name?

15   A    Fethullah Karademir.

16   Q    Okay.  And do you know my client, Mujera Lungaho?

17   A    I can't hear you.  What did you say?

18   Q    How do you know my client, Mujera Lungaho?

19   A    Yeah, he used to work next door in Avis.  And then he --

20   one day he came, he told me that he want to -- he want to work

21   with me.  I know --

22   Q    Where is that?

23   A    In McCain Mall.

24   Q    Okay.  And what store do you operate?

25   A    The Fix, phone repair shop.

1  Q   Okay.  And so, how long has Mujera been working at The

2  Fix?

3  A   It's almost two months.

4  Q   Okay.  And then, what are the store's hours?

5  A   The week is like -- sometimes they change the hours, but,

6  usually, the weekdays is from 11:00 to 8:00.  And Friday and

7  Saturday is from 10:00 to 9:00.  Sunday is from 12:00 to 6:00

8  p.m.

9  Q   And then, how many hours has Mujera been working for you

10 during this time on a weekly basis?

11 A   Weekly, like around 40.

12 Q   Okay.  And when he's doing a shift, is it a full shift,

13 from like 11:00 to 8:00 and 10:00 to 9:00?

14 A   No.  Like, mostly like from 11:00 to 6:00.  But I was not

15 here two weeks.  He worked two weeks full.

16 Q   So he was the solo operator during that time?

17 A   Yeah.  Last two weeks I was not here, he take care about

18 the business.

19 Q   Okay.  And when -- when was that two week trip?

20 A   The last two weeks, it start from for, I think, four --

21 no, 24th to 5th of August.

22 Q   Okay.  And so, during that time, he was opening and

23 closing?

24 A   Yes.

25 Q   And then, does -- does your business actually do the cell

1  phone repairs?

2  A    Yes.

3  Q    Okay.  So, does he handle those?

4  A    Yeah, I trained him like one and a half months.

5  Q    Okay.  And how is he as an employee?

6  A    He's good so far, so like hard working.

7  Q    Is he --

8  A    I don't have any complaint about him.

9  Q    Is he good with the actual customers?

10 A    Yeah.  Yeah.  Yes.  He's so nice with the customers.

11 Q    And then, is he good on the repair side as well?

12 A    Well, I cannot say like in two months in full, but he is

13 so smart.  He learned almost like 60 percent of the repair.

14 I'm still teaching him.

15 Q    But he's a quick learner?

16 A    Yeah.

17 Q    Okay.  At this point, is he an essential part of your

18 business?

19 A    I didn't understand.

20 Q    Is he -- is he a very important part of your business at

21 this point?

22 A    Yeah.  Now, yeah, he is my -- in our language we say he's

23 my right-hand.

24 Q    Yes, sir.  And in this time, have you gotten to know him

25 as a person, beyond just being your employee?

1   A   I'm sorry, I didn't understand.

2   Q   Have you gotten to know him as a person, beyond just being

3   your -- you know, the guy that works at your store?

4   A   I didn't understand the question.  You know my English is

5   not so good.

6   Q   Yes, sir.  Have you gotten to know Mujera as a -- as a

7   person, not just as someone who -- who works at the shop?

8   A   Yeah.

9   Q   And, I mean, do you have anything positive or negative to

10  say about him as a person?

11  A   Oh, no, so far, he's very good.  So, like -- like respect

12  people.

13  Q   Okay.  I appreciate --

14  A   So, for me, it's like ideal person to work with him.

15  Q   Does it get stressful in the cell phone repair

16  environment?

17  A   No, not -- no.

18  Q   Okay.

19          MR. KAISER:  I would tender the witness.  Thank you,

20  sir.

21          THE COURT:  Okay.  Ms. Williams, do you have any

22  questions for the witness?

23          MS. WILLIAMS:  Just a few, Your Honor.

24                          CROSS EXAMINATION

25  BY MS. WILLIAMS:

                          Karademir - Cross                      53

1   Q    Hello.  Do you -- what time does the mall close?

2   A    Mall close -- weekdays, close like 8:00.  Weekends, 9:00.

3   Q    And do you close up after the mall closes?

4   A    Sometimes, when it's not busy, we close like one hour

5   early.

6   Q    Are you there in the evenings when you close up, when you

7   lock up the store?

8   A    Yes.

9   Q    Do you -- so you lock up at night every night?

10  A    Do I what?

11  Q    What time do you lock up the store at night?

12  A    Like, maximum, nine o'clock, everybody has to close.

13  Q    Okay.  Thank you.

14        MS. WILLIAMS:  No further questions for this witness,

15  Your Honor.

16        THE COURT:  Mr. Kaiser, any redirect?

17        MR. KAISER:  No, ma'am.

18        THE COURT:  Okay.  Thank you, sir.  That concludes

19  your testimony.  You can --

20        THE WITNESS:  You're welcome.

21        THE COURT:  -- you can leave the call.

22        MR. KAISER:  Thank you, sir.

23        THE WITNESS:  Yeah.  No problem.  Thank you.

24        THE COURT:  Okay.  Mr. Kaiser, any additional

25  testimony or exhibits?

1      MR. KAISER:  No, ma'am.

2      THE COURT:  All right.  Ms. Williams?

3      MS. WILLIAMS:  Just argument, Your Honor.  Are you

4  ready?

5      THE COURT:  Do either of you object if I have a quick

6  question for Mr. Umphenour?

7      MS. WILLIAMS:  No.

8    (MICHAEL UMPHENOUR, PREVIOUSLY SWORN, RECALLED.)

9  BY THE COURT:

10  Q   Mr. Umphenour, there was some testimony about a number, a

11  phone number, that was given to the Defendant.  And it was not

12  Mr. Riggs's phone number.  Did you recognize the phone number?

13  A   So, the number, I don't recognize.  But, typically, it's

14  probably -- most likely one of our officers.  And how it works

15  is, when we have a duty officer, there is that line -- the

16  main line that we give them, it's (501) 319-8000.  It's ported

17  and connected to the duty officer.  And so, when a officer

18  calls them back, let's say, like last weekend that officer

19  called that person back, it wouldn't show the duty line, it

20  would show their number.  So, if you tried to contact the duty

21  officer from last weekend from that -- from the other number

22  it showed, you're not going to get him.  And that's why we

23  have our clients sign a contract at the start of supervision,

24  and Mr. Lungaho signed one here in April when we switched

25  equipment, and it states, "On weekends, you must call the duty

1  line and you must speak with an officer directly."  "Speak

2  with an officer directly."  Because the duty line --

3  Q    Is it --

4  A    I'm sorry.

5  Q    Go ahead.

6  A    The duty line does not accept texts.  It's a call porting

7  service.  Basically, it transfers the call from that duty line

8  to whatever officer is covering that weekend.

9  Q    Okay.

10  A    And so, when that officer covers (sic) back, you're only

11  -- calls you back, you're not going to see the duty line,

12  you're going to see that officer's number.  So, that means --

13  Q    Okay.

14  A    -- the following weekend, if you try to call that officer,

15  you're not going to reach him.  You have to call the duty line

16  every single time.

17  Q    And does the contract say what the duty line number is?

18  A    Yes, ma'am.  I can -- I can read the section to you if

19  you'd like.

20  Q    No, what -- what is the duty number?  Just remind me.

21  A    It's -- it is (501) 319-8000.

22  Q    And is that a different number than the one Mr. Lungaho

23  was referencing?

24  A    Yes.  That would be -- most likely, that was the number of

25  the duty officer for whatever weekend that they called Mr.

1  Lungaho.

2  Q   Okay.

3  A   And instead of calling the (501) 319-8000, this is

4  speculation, he called the duty officer from that weekend who

5  called him.

6  Q   Okay.  Okay.  Thank you.

7          MR. KAISER:  Your Honor, if I -- if I can just

8  clarify?  I just sent the text message.  It appears it was

9  Officer Glass who was the duty officer on that particular --

10         THE COURT:  Okay.  Okay.

11         MR. KAISER:  Yeah --

12         THE COURT:  That helps.  I appreciate it.  And if I

13  raised any questions that either of you would like to follow

14  up with Mr. Umphenour on, you're welcome to do so.  I just

15  needed clarification.

16         MR. UMPHENOUR:  Yes, Your Honor.

17         MR. KAISER:  No, ma'am.

18         MS. WILLIAMS:  No.  No questions.

19         THE COURT:  Okay.  Okay.  Very good.

20         All right.  I'm happy to hear argument.  Ms.

21  Williams, you may proceed.  You're on silent.

22         MS. WILLIAMS:  Can I look at the email of the text

23  message real quick?

24         THE COURT:  Sure.

25         MS. WILLIAMS:  Has it been sent?

1          MR. KAISER:  Yes.

2          MS. WILLIAMS:  Okay.

3          THE COURT:  Did you send it, Mr. Kaiser, to my

4  chambers?

5          MR. KAISER:  I sent it to Ms. DuBose, yes, ma'am.

6          THE COURT:  Okay.  She should be sending it to me

7  then.

8          THE COURTROOM DEPUTY:  I have not received it yet,

9  Judge, but I'm watching for it.

10          THE COURT:  Okay.  Okay.

11          MS. WILLIAMS:  Did it have a date on it?  What date

12  was that?

13          MR. KAISER:  August 8th --

14          MS. WILLIAMS:  August.

15          MR. KAISER:  -- or just that Sunday, but it was

16  August -- it was August 8th.

17          MS. WILLIAMS:  Okay.  And there is no violation on

18  that date.  Okay.

19          So, Your Honor, the United States would like to move

20  forward on every violation except for June 13th when Mr.

21  Lungaho was at church.  And I think -- I believe that we have

22  put on enough evidence to show that all the violations did

23  actually occur.

24          I want to just start by saying that the standard

25  changes.  The standard changes in a revocation.  It's now

1   whether or not Mr. Lungaho is likely to abide by any

2   combination or condition -- any condition or any combination

3   of conditions.  And he has shown, on multiple occasions, that

4   he is not.

5           He -- with the violation -- excluding the violation

6   on June 13th, he has 27 violations since our last revocation

7   hearing, including three failures of urinalyses that showed

8   new use for marijuana.  And we -- I already tried to revoke

9   him once, and he had already failed for marijuana three times.

10  So, in the less than a year that he's been on supervision, he

11  has failed seven drug tests.  And that is not including all

12  the times that he missed his drug screenings.  And he has not

13  been screened since June.  It's now August.

14          And in the meantime, he gets arrested, at 4:00 a.m.,

15  for public intoxication.  He can say he's innocent until

16  proven guilty, it does not -- there is no way that he can say

17  he was not there at 4:00 a.m., at Springhill Baptist, so

18  intoxicated that he urinated himself, with marijuana in his

19  pocket.  The marijuana is yet to be -- yet to be proven in

20  court; however, we do have a police report.  And it's only by

21  clear and convincing evidence that we have to prove that he --

22  that he violated his conditions.

23          And with Mr. Lungaho, it's -- when I say that he

24  cannot abide by conditions, it is because every -- everything

25  with him is an excuse.  It's -- he has an excuse for every

1  time he's late.  He has an excuse for everything that he does.

2  And as his employer said, he's very smart.  He skates the

3  line.  He knows he'll get revoked if he does this, but he goes

4  right up on that line, and he violates the minimum, because

5  he's smart enough to do that.  And I -- I feel like he doesn't

6  believe that you will revoke him, because he's just barely

7  violating the conditions.  Just -- and it's an excuse for

8  everything, "Oh, I had to be at work.  I had to be at work at

9  1:00 a.m., even though my boss testifies that my office closes

10 at 9:00 every night."  "I had to go to a charity event, but

11 somehow I ended up at Springhill Baptist, very intoxicated,

12 with marijuana in my pocket."  But, everything is half truths.

13 And by his testimony, you know, he can't admit that he -- even

14 though you have the documents that show that he failed

15 urinalyses for marijuana use, he can't even admit those

16 violations.  It would show more to his credibility if he would

17 admit some, and deny those that there was a question about.

18         And he's shown over -- I counted earlier all of the

19 violations since he's been on pretrial release, it's over 50.

20 I've never seen that in my entire time working here or for

21 when I worked for Judge Volpe.

22         And, for those reasons, the United States asks for

23 his detention, because he cannot -- he has shown on multiple

24 occasions that he is unlikely to abide by any condition that

25 you place upon him.  And, frankly, it's almost like he's

1  throwing it into the Court's face, like, "I'm just going to

2  violate it."  Even as he said to me, "I texted them, but they

3  didn't answer, so I violated anyway."  And that's how he's

4  been on the entire time he's been on supervision.

5          For those reasons, I ask for his detention.

6          THE COURT:  Okay.  Thank you.

7          Mr. Kaiser?

8          MR. KAISER:  Your Honor, I do agree with the

9  Government on one point, and it's that my client does have a

10  legitimate excuse for a lot of these things.

11          There also seems to be just a really big

12  misunderstanding about my client's conditions.

13          My client is -- his main -- one of his main

14  conditions was to continue or actively seek employment.  There

15  is no condition requiring a change of employment to be

16  reported, the way there is a condition for a change in

17  residence.  So, he's -- in his attempting to comply with that

18  condition, he -- he's being punished.

19          He's somebody who doesn't have a very good

20  transportation setup.  Has to rely on our admittedly not great

21  public transportation.  He's trying to work a full schedule at

22  one job, while moonlighting in any way he can at other jobs.

23          I understand that the supervision office has a really

24  good -- you know, they've described as perfect system, where

25  not one call gets through.  But, as we heard from Riggs,

1  they're human beings, and sometimes they have to go to sleep,

2  and sometimes they're dealing with other calls.  And so, the

3  reality is, when my client has attempted to call, he cannot

4  get through to anyone, and only when they get a notification

5  that he is out of location do they contact him.

6          I can't fix the fact that things come up on a

7  Saturday at 9:00 p.m., and the United States Probation Office

8  doesn't have the full office on staff that day.  I mean, that

9  makes sense; they have lives too.

10          I do want to correct one thing that Ms. Williams

11  stated.  My client was arrested July the 10th, in the early

12  morning, and he attended a charity event 36 hours later, on

13  July 11th.  So, it -- the Government seems to be saying he was

14  using a charity event as the guise to go out on this night.

15  That is not the case at all, and that's not even the

16  allegation in the petition.

17          The Government is kind of trying to make my client

18  out to be some evil genius, trying to like throw something at

19  the Court, when, in fact, he's just a working stiff who is

20  trying to continue generating income while facing the threat

21  of life in prison.

22          There is absolutely no allegation that he has

23  committed a felony.  There is no allegation that he is a

24  person who will even attempt to flee or even has the means to

25  do so.

1    There is no allegation that he poses a danger to the

2    safety of any other person in the community.  I -- I mean, I

3    guess I heard some sort of, you know, if it's believed what

4    occurred at the arrest, to himself.  But that is not what the

5    statute ponders.  It only deals with the safety of any other

6    person in the community.

7    The majority of these violations are ticky-tacky at

8    best.  They are location monitoring violations, where he was

9    as -- as much verification as the supervision officers did,

10   which was minimal, showed that he was in fact working in

11   almost every one of those cases or at church.

12   As the Court will see, the vast majority of these

13   location monitoring violations were on Saturdays or Sundays or

14   Fridays, and almost all of the others were out of regular

15   business hours.

16   We believe that there are -- assuming the Court does

17   make a finding by clear and convincing evidence that my client

18   has violated any condition of release, there are a condition

19   or combination of conditions that can address these -- these

20   violations.  At this point, he is only required not to consume

21   alcohol excessively, and we could propose a condition where

22   there is a complete bar to the consumption of alcohol, and

23   would request potential services related to the use of that

24   substance.

25   Further, if we could have some sort of condition

63

1    requiring such reporting of employment changes or scheduling

2    changes to make it explicitly clear.

3          Here, he's -- he's -- he's being attacked, he's being

4    alleged to violate a condition that doesn't exist in service

5    of a condition that does.

6          So, this is not a situation where my client is out

7    committing new felonies.

8          It's not a situation where he's out committing

9    conduct similar to what he is charged with in this admittedly

10   serious case.

11         It's -- it's a case where my client is trying to

12   work, trying to make a living, trying to supplement his

13   income, and just does not have the transportation abilities to

14   get to and from the places he needs to go quickly.

15         We trust the Court's discretion in this case, but we

16   would ask the Court to save this spot for someone more

17   deserving, who actually poses a danger to our community or a

18   threat to flee the jurisdiction, which my client, admittedly,

19   by both Probation Officers, does not.

20         THE COURT:  Let me ask you a question.  His boss at

21   The Fix it place says he closes up every night at nine

22   o'clock.  What's he doing after that, that I'm not -- I'm not

23   understanding where he's going or what he's doing?

24         MR. KAISER:  Your Honor, he's -- he's closing up the

25   shop, and then he's getting home through the public

1  transportation options that we have in this city.

2  Unfortunately, we're not New York, there's not a great subway.

3  Rock Region is doing its best.  But, as he's testified, it

4  often takes him a period of hours just to get from one place

5  to another that are only a few miles.

6           THE COURT:  Okay.

7           MR. KAISER:  It's an unfortunate reality that he's

8  living with, and he's trying -- trying to get to a point where

9  he can have solid transportation by working one job and

10  supplementing it with moonlighting other jobs.

11          THE COURT:  Okay.  Any final words, Ms. Williams?

12          MS. WILLIAMS:  No.  Thank you, Your Honor.

13          THE COURT:  Okay.  All right.  I'm going to -- as you

14  know, what I'm supposed to do is determine if there is clear

15  and convincing evidence that Mr. Lungaho has violated a

16  condition of release.  And I don't -- I don't find that he is

17  a danger to the community or a flight risk.  But, I am going

18  to need to determine whether he is likely to abide by any

19  condition or combination of conditions based on his conduct up

20  until now.

21          I do find that he has violated conditions of release

22  as follows:

23          He did fail to attend counseling, I will also -- on

24  April 2 and 9, but has attended since then.  I -- but, I do

25  find that he did not attend those.

1            I find that he violated his conditions by failing to

2   submit urine specimens on April 20, June 28, and July 8.

3            I'm finding that he was positive for marijuana on

4   April 21, May 4, May 12, and June 14, and that those were new

5   use.

6            And as far as the violations by returning to his

7   residence late, there are a number of those, 16 of those, I

8   believe, not including prior violations.  And I -- I can

9   understand transportation problems.  Some of these though, I

10  have doubts about whether it's a transportation issue.  For

11  example, May 16, and I believe that was when Mr. Umphenour was

12  still supervising, he returned to his residence at 2:23 a.m.,

13  and I'm not -- I have not heard any testimony about him

14  receiving notice -- or maybe I have, I'm trying to look at my

15  notes here.  I have moonlighting, work opportunity.  He was

16  scheduled to be there at -- return at 1:00 a.m.  So, 2:23

17  a.m., he was late.

18           On all of these, I'm going to find that he was late,

19  and that it is a technical violation.  Unfortunately, because

20  he's not being monitored by GPS, we can't -- we don't know

21  where he was.  I'm going to give him the benefit of the doubt

22  on most of these out of range -- so, June 4th, for example, he

23  apparently was home but went out of range at 9:41, but

24  returned back at 11:20.  We don't know where he was or what he

25  was doing.  And he went out of -- June 5th, I'm -- I'm not

1  going to find that to be a violation.  June 6th, I'm not going

2  to find that to be a violation, other than a technical one,

3  because -- let me back up.  I don't want to get bogged down on

4  these.  All of these are technical violations.  I have heard

5  testimony that he did not receive permission from the

6  officers, who were assigned to him, to -- to be late.  I'm

7  going to find that on some of these occasions, he did have

8  difficulty with transportation, and I'll give him a break on

9  those.  So, I think that is reasonable.

10       However, I don't understand him being out at 4:00 in

11  the morning on July the 10th, where he wasn't supposed to be,

12  intoxicated, and I find that's a violation of his conditions,

13  including the possession of marijuana, et cetera.

14       I find that Mr. Lungaho was provided with a duty line

15  that he could call whenever he needed to.  He has indicated

16  that he called on, I think, August -- well, at some points, he

17  called a specific number that's not the duty line.  There's

18  not any evidence about how often he called that number or when

19  he called that number.  But what the evidence shows is that he

20  did receive information about what line to call.  The officers

21  have testified there's no evidence that he called.  And so,

22  I'm going to find that he -- he did not call, as he was

23  supposed to call, the number that he was supposed to call.

24  And so, that makes it impossible to know where he was or what

25  he was doing.  And I'm also -- I think it's convenient that he

1  -- although he is a very smart guy, that he indicates he

2  called the wrong number when he did.  He never called --

3  there's no testimony that he called his officers to say that,

4  "Hey, I'm not getting any response from the duty number that

5  I'm calling."  There's no evidence that he did that.  So, I

6  find it suspect that it's -- that he called this wrong number

7  many, many times, to get permission.

8          This being out of range at 2:10 in the morning and

9  returning at 5:51 in the morning to -- while he was taking a

10 smoke and taking out the trash, I don't buy that at all.

11 That's a violation to me.

12         And, basically, an overview of all of this suggests

13 to me that, as Ms. Williams said, he pushes the line, he

14 pushes the limit, and he is then able to come in and say,

15 "Well, I did this," which is not what he was supposed to do,

16 but that it excuses the technical violations of being out of

17 range.  I mean, I -- I agree, Ms. Williams, I haven't ever had

18 a defendant with this many violations.  And they're not -- you

19 know, they're not violent, they're not using drugs, other than

20 a few times, but they -- they show a lack of interest or

21 desire to comply with these conditions.  And this is the

22 second time we've been here about these issues.

23         I mean, I don't know what I'm supposed to do to

24 require -- to get him to comply with these conditions.  It's

25 not complicated to communicate with your officer.  You've got

1  the officer available to you during regular work hours that

2  you can contact.  And you've got a phone number to call for

3  off-duty, after hours calls, that he received in this contract

4  that he signed.  And apparently, didn't do that.

5          I just -- I -- I'm going to find that I don't -- I'm

6  uncomfortable that any conditions I can impose would be --

7  that he would likely abide by.  And I'm going to find that he

8  needs to be revoked.  I think that he's been given lots of

9  opportunities to comply and he just doesn't seem to be

10 interested in doing that.

11         Obviously, Mr. Kaiser, you are welcome to appeal this

12 decision.  And maybe you can get a hearing in front of Judge

13 -- DPM -- Judge Marshall and you can get it -- get me

14 reversed.  And that's perfectly fine.

15         But, based on the record I'm sitting here looking at,

16 and the record from the beginning, I just don't find that Mr.

17 Lungaho is interested in complying with his conditions of

18 release.

19         I -- I credit him for wanting to work, but that

20 doesn't mean he can't -- he doesn't have to communicate.  He

21 does.  This is all about communication.  And he's not doing

22 it.

23         And so, I'm going to revoke him.  I'm going to order

24 Mr. Lungaho to turn himself in to the Marshals Service this

25 afternoon and -- and to be processed and to go into custody.

1    MR. KAISER:  Your Honor, for record purposes, I just

2    need to offer the alternative of full location monitoring,

3    rather than just a home base.  It seems like that would

4    address almost all of the violations the Court found, and that

5    is an option that I believe, short of detention, that could be

6    imposed.

7    THE COURT:  Didn't we do that at the beginning?  I --

8    I think, when I first -- when I first put him on conditions,

9    he was -- wasn't he on virtual monitoring at that time?

10    Yes, Mr. Umphenour?

11    MR. UMPHENOUR:  Your Honor, he was.  His component

12    though has been home detention this entire time.  The

13    technology has changed, but the component has still been home

14    detention.  I believe counsel is asking for home

15    incarceration.  Is that what I hear you asking, or am I

16    incorrect on that?

17    MR. KAISER:  Well, I'm asking for full GPS

18    monitoring, based on something attached to his person.

19    Alternatively, full home detention as well.

20    MR. UMPHENOUR:  Well, he's currently on home

21    detention.  As far as GPS, we don't have that available in

22    district at this time in terms of the ankle monitor.

23    THE COURT:  Okay.  What we had him on though was the

24    phone monitoring.  Is that where you call -- initially, where

25    you call and he's supposed to call back?  Is that what we

1 initially had him on?

2        MR. UMPHENOUR:  Yes, Your Honor, and that we

3 struggled mightily with the check-ins on that and --

4        THE COURT:  So, that -- that presented difficulties.

5        And I -- I accept your objection, Mr. Kaiser, but I

6 believe that we tried him on the phone monitoring, where he

7 was -- he could be monitored in terms of where he was, he

8 could call back when he was contacted to verify his location,

9 and that failed as well, and that's why we put him on the

10 location monitor on his ankle, is -- is my understanding.

11        So, I will -- my -- my order and my findings stand.

12 I will enter a written order this afternoon, or it may be

13 tomorrow.  And I -- actually, I'm going to revise my ruling

14 and order Mr. Lungaho to check in with the Marshals Service

15 first thing in the morning, instead of this afternoon, to give

16 him an opportunity to prepare to be -- to be gone.  So, first

17 thing in the morning, by 9:00 a.m., Mr. Lungaho needs to

18 appear at the Marshals Service to be taken into custody, and I

19 will enter an order this afternoon revoking his release.

20        And, Mr. Kaiser, I understand and I expect you will

21 appeal that, and you may certainly do so.

22        That will be my ruling.  And that will -- is there

23 anything else I need to take up?

24        MS. WILLIAMS:  Not from the Government, Your Honor.

25        THE COURT:  Okay.

1        MR. UMPHENOUR:  Your Honor?

2        THE COURT:  Yes.

3        MR. UMPHENOUR:  I want to double check, he -- just so

4   everybody is aware, he's still remaining on location

5   monitoring until he surrenders tomorrow morning, correct?

6        THE COURT:  Yes.  Yes.

7        MR. UMPHENOUR:  Okay.

8        THE COURT:  Yes.

9        MR. UMPHENOUR:  And then, Mr. Kaiser, while I have

10  you here, would you speak with him on making sure that he

11  brings his equipment up so his mother doesn't have to bring it

12  up later to our office?

13        MR. KAISER:  Yes.

14        MR. UMPHENOUR:  Thank you.

15        THE COURT:  Thank you.  Okay.  That will be the

16  conclusion of this hearing.  The Court is in recess.

17      (Adjournment at 11:44 a.m.)

18        ELECTRONIC SOUND RECORDING CERTIFICATION:

19  I, court approved transcriber, certify that the foregoing is a

20  correct transcript from the official electronic sound

21  recording of the proceedings in the above-entitled matter.

22

23  /s/Robin Warbritton                    September 23, 2021
    Signature of Approved Transcriber      Date

24

25  Robin Warbritton
    Typed or Printed Name