IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| VS. ) | CASE NO. 4:20-cr00288-DPM |
| ) | |
| MUJERA LUNG'AHO ) | |

### BRIEF IN SUPPORT OF MOTION TO DISMISS

Comes now the Defendant Mujera Lung'aho by and through his attorney Michael Kiel Kaiser of Lassiter & Cassinelli, and for his brief, states:

**Q:** Was the vehicle paid for, in whole or in part, through federal financial assistance?

**A:** Based on disclosures by the United States and publicly available records, no.

**Q:** Did the Little Rock Police Department, the North Little Rock Police Department, or the Arkansas State Police receive federal financial assistance during the relevant period? If so, what are the key details?

**A:** Yes, each agency received a small amount of federal money relative to their overall budget. Pursuant to stipulation with the United States, the North Little Rock Police Department (NLRPD) received a single Edward Byrne Memorial Justice Assistance Grant of $37,170 used to purchase Tasers and first-aid equipment during fiscal year 2020. During the same year, the NLRPD's budget was $23,804,459. *See*

*North Little Rock Police Department 2020 Annual Report.* Thus, only 0.156% of NLRPD's 2020 budget came through federal funding.

Similarly, the Little Rock Police Department (LRPD) received a very small portion of its 2020 budget through federal funding. According to records disclosed by the United States, the LRPD received two federal grants totaling $832,968 in 2020: one for $786,845 in COVID emergency supplemental funding, and one Project Safe Neighborhoods Award of $46,123. LRPD's 2020 budget was $80.22 million. Thus, LRPD received a mere 1% of its 2020 budget through federal funding. *See City of Little Rock 2020 Annual Operating Budget* at 133.

**Q:** Is the LRPD, the NLRPD, or the ASP a qualifying "institution or organization" within the meaning of 18 U.S.C. § 844(f)(1).

**A:** No, but even if so, there is no constitutional authority for Congress to enact a statute making it a crime to damage or destroy personal property owned by "any institution or organization receiving Federal financial assistance," particularly given the meager amount of assistance given to the local and state police agencies involved in this case.

**Q:** Is a limiting construction of the statute available in this case to avoid any constitutional problem? *E.g., United States v. Hersom,* 588 F.3d 60, 66-67 (1st Cir.

2

2009) (indirect support); *United States v. Kimberlin,* 805 F.2d 210, 243 (7th Cir. 1986) (federal instrumentality).

**A:** Yes, but with a different result. In *Hersom*, the First Circuit held 18 U.S.C. § 844 "is generally limited to property owned or possessed using federal financial assistance . . . ." 588 F.3d at 67. Ultimately, the First Circuit found that 18 U.S.C. § 844 was properly applied to Hersom's case involving the arson of four buildings renovated with city funds obtained through a Department of Housing and Urban Development grant specifically for renovating such buildings. *Id.* at 68. Here, none of the vehicles at issue were purchased or renovated or touched in any way by the menial federal funds received by any of the local and state agencies at issues. Similarly, in *Kimberlin*, the building at issue was a school for children with disabilities that was funded 40% by the federal government. 805 F.2d at 243. By contrast, the local and state agencies at issues receive a menial portion of their overall budget from the federal government and do not use those meager phones to purchase or maintain department vehicles. Both *Hersom* and *Kimberlin* weigh heavily in Lung'aho's favor.

**Q:** If federal financial assistance did not pay for the damaged vehicles in whole or in part, through the Property Clause can Congress criminalize damage to those vehicles by arson?

**A:** No. As the district court for the Eastern District of Michigan found in *United States v. Brown*: "[*United States v.*] *Walter* and the other cases cited make it clear that for the Property Clause to be properly invoked as a basis for congressional enactment, some actual and substantial property interest of the federal government must be involved." 384 F. Supp. 1151, 1157, (E.D. Mich. 1974), *rev'd on other grounds*, 557 F.2d 541 (6th Cir. 1977).

And just as in *Brown*—which involved the arson of a Planned Parenthood clinic—there is no such interest here. No federal money was used to purchase or maintain the vehicles at issue. The federal government has no property interest in the NLRPD, LRPD, or ASP, nor in any of its property. "To expand the applicability of the Property Clause into far-reaching areas so as to include the property of recipients of all federal funds controverts the original intent of the Property Clause and goes far beyond any previous judicial interpretation." *Id.* at 1157-1158.

**Q:** Did Congress adopt 18 U.S.C. § 844(f)(1) pursuant to the Property Clause?

**A:** Yes. Although the preamble to Title XI of the Crime Control Act states the congressional purpose of the act is to protect interstate commerce, the *House Report* makes clear that § 844(f) relies instead on the Property Clause for its basis. *Brown*, 384 F. Supp. at 1155-1156.

**Q:** Is Congress's specification of the source of its authority conclusive?

**A:** No. "The 'question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 570 (2012) (quoting *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948)).

**Q:** Does the statute stand as to Lungaho's alleged conduct, in any event, pursuant to Congress's authority under the Necessary and Proper Clause, U.S. CONST. art. I,§ 8, cl. 18; the Spending Clause, U.S. CONST. art. I, § 8, cl. 1; or the Commerce Clause, U.S. CONST. art. I, § 8, cl. 3?

**A: (1) Commerce Clause**: "Although Congress need make no formal findings as to how the regulated activity affects interstate commerce, in order for there to be a rational basis for congressional action the evidence at the hearings must indicate the nature and effect of the burdens on commerce which Congress meant to alleviate." *U.S. v. Brown*, 384 F.Supp. 1151, 1160 fn. 6 (E.D. Mich. 1974). As *Brown* notes, "as to Section 844(f) there was no congressional finding as to how the proscribed activity burdens interstate commerce." *Id*. Consequently, 18 U.S.C. § 844(f)(1) cannot rely on Congress's authority under the Commerce Clause.

**(2) Necessary and Proper Clause**: "The [Necessary and Proper Clause] is not itself a grant of power, but a caveat that the Congress possesses all the means necessary to carry out the specifically granted 'foregoing' powers . . . and all other Powers vested by this Constitution.'" *Kinsella v. U.S. ex rel. Singleton*, 361 U.S. 234, 247 (1960). Consequently, no law enacted by Congress may be upheld under the Necessary and Proper Clause unless it "involve[s] exercises of authority derivative of, and in service to, a granted power." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 560 (2012). Therefore, the Necessary and Proper Clause, standing alone, does not authorize Congress's enactment of 18 U.S.C. 844(f)(1).

"The Necessary and Proper Clause does not override other provisions of the Constitution." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 455 (D.C. Cir. 1982), *aff'd sub nom. Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983). "[The Necessary and Proper Clause] authorizes Congress to 'make all laws,' not to exercise power in any way it deems convenient." *Id*. "That a power is clearly committed to Congress does not sustain an unconstitutional form in the exercise of the power." *Id*.

**(3) Spending Clause**: "Congress has authority under the Spending Clause to appropriate federal moneys to promote the general welfare, and it has corresponding authority under the Necessary and Proper Clause to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not

6

frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars." *United States v. Bahel*, 662 F.3d 610, 630 (2d Cir. 2011) (quoting *Sabri v. United States*, 541 U.S. 600, 605 (2004)).

The corruption cases are distinguishable from *Brown* and the present case, because the statute prohibiting bribes and kickbacks works as an "anti-corruption enforcement mechanism" that is sufficiently related to the Government's exercise of its power under the Spending Clause to "dispel any doubt as to its constitutionality. *See United States v. Fitzgerald*, 514 F.Supp.3d 721, 746 (D. Md. 2021). Such a relationship to the exercise of the Spending Power is not present in Section 844(f)(1). Also, Section 844(f)(1) does not include similar built-in mechanisms to protect individuals from overly aggressive prosecution and arbitrary enforcement. Lastly, criminal sanctions are not a "proper" exercise of power in this context because the expansive reach of the Government's interpretation of this power infringes upon the States' sovereignty with regard to their exercise of police powers, the most basic of which is the enactment and enforcement of criminal sanctions for intrastate conduct.

WHEREFORE the Defendant prays his motion to dismiss be granted.

Respectfully submitted,

**/s/ Michael Kiel Kaiser**
ABN 2015001
Michael@lcarklaw.com

**Attorney for Defendant**
LASSITER & CASSINELLI

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and transmitted a copy via electronic transmission to:

Stacy Williams
Assistant United States Attorney
Email: Stacy.Williams@USDoJ.gov