```
 1              IN THE UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF ARKANSAS
 2                     CENTRAL DIVISION

 3   UNITED STATES OF AMERICA

 4              Government        Case No.  4:20-cr-00288-DMP
                                 December 7,  2023
 5       vs.                     Little Rock, Arkansas
                                 9:08 a.m.
 6   MUJERA BENJAMIN LUNG'AHO

 7              Defendant

 8

 9          TRANSCRIPT OF SENTENCING HEARING

10       BEFORE THE HONORABLE D.P. MARSHALL

11           UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14   On Behalf of the Government:

15       JOHN RAY WHITE
         Assistant United States Attorney
16       P.O. Box 1229
         Little Rock, Arkansas 72203
17
     On Behalf of the Defendants:
18
         MICHAEL K. KAISER
19       Lassiter & Cassinelli
         1218 West Sixth Street
20       Little Rock, Arkansas 72201

21

22

23

24       Proceedings reported by machine stenography and
     displayed in realtime; transcript prepared utilizing
25   computer-aided transcription.
```

1    P R O C E E D I N G S

2        THE COURT:  Thank you.  Good morning, everyone.

3    Y'all may be seated.

4        This is the United States against Mujera Benjamin

5    Lung'aho.  Good morning, Mr. Lung'aho.  Mr. Kaiser is here

6    at his client's side.  The United States is here in the

7    person of Mr. White.  And we have Agent Hicks, I believe.

8    Welcome to all of you, and the courtroom full of people.

9    It's good to see you all.

10        Mr. Lung'aho, my job today is to decide what's the

11    fair and just sentence under law for you.  We'll start

12    with the usual preliminaries, then we'll have an under

13    seal proceeding.  After that, the lawyers and I will work

14    over the presentence report and I'll do the advisory

15    guideline calculation, which is the starting point but not

16    necessarily the ending point of my sentencing decision

17    under law.  There are many other things that I'm supposed

18    to and will consider in deciding what's the just and fair

19    sentence:  You as a whole person, what happened here with

20    these -- the destruction or damage to the police cars and

21    the circumstances of the crime, what's needed to punish

22    you justly and deter you from engaging in this kind of

23    violent activity again, what's needed to deter others from

24    doing so, what's needed to protect the public.

25        There are many things that I'm supposed to consider

1   and will under the guideline statute.  To help me do that,

2   I'll hear -- after I do the advisory guideline

3   calculation, I'll hear argument from each of the lawyers.

4   And when I get past the lawyers, if you wish to speak to

5   me, you may do so and I welcome whatever you have to say.

6   At the same time, though, if you don't want to speak or

7   want to let Mr. Kaiser do most of the talking, that will

8   be fine, too.  I'm not going to hold it against you if you

9   choose not to speak.

10          Then I'll decide the sentence, explain my reasoning,

11  ask the lawyers to double check me and make sure that I

12  haven't forgotten anything, then I'll impose the sentence

13  on you, give you some advice about your appeal rights, and

14  we'll be done.

15          That's the road map for this morning.

16          Let's go back to those preliminaries.  If you'll

17  please stand and raise your right hand, my deputy will

18  give you the oath.

19          (The oath was administered.)

20              THE COURT:  Very good.  You may be seated.

21          Tell me the truth, Mr. Lung'aho, because it is a

22  crime if a man lies after he has taken the oath.

23          Do you understand?

24              THE DEFENDANT:  Yes.

25              THE COURT:  Good.  Thank you for speaking up and

1    using your outside voice.  We don't have microphones here

2    in our 1957 Era Faithful Courtroom, so we all must speak

3    up.

4         Is your mind clear?

5              THE DEFENDANT:  It is.

6              THE COURT:  Did you understand my outline of the

7    ground we needed to cover this morning?

8              THE DEFENDANT:  I did.

9              THE COURT:  Are you under the influence of any

10   substance at all that affects your thinking?

11             THE DEFENDANT:  No.

12             THE COURT:  Are you taking any medicine,

13   prescription or over-the-counter?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Does that cloud your mind or clarify

16   your mind?

17             THE DEFENDANT:  No, it does not.

18             THE COURT:  Help me a bit there.  It does not

19   cloud?

20             THE DEFENDANT:  No, it does not.

21             THE COURT:  Okay.  Good.  I wanted -- I need to

22   be sure that your mind is clear.  Is it?

23             THE DEFENDANT:  It is very clear.

24             THE COURT:  Good.  How has -- how has Mr. Kaiser

25   done from the beginning until today as your lawyer?

1     THE DEFENDANT:  He's done very well.

2     THE COURT:  Has he communicated with you?

3     THE DEFENDANT:  Yes.

4     THE COURT:  Explained your options?

5     THE DEFENDANT:  Yes, he has.

6     THE COURT:  Answered your questions?

7     THE DEFENDANT:  Yes.

8     THE COURT:  Good.  The presentence report that

9  the probation office has prepared, I see that it's gone

10  through a couple of revisions.  Has Mr. Kaiser reviewed

11  that with you?

12     THE DEFENDANT:  Yes.

13     THE COURT:  Good.

14  Mr. Kaiser, how are you this morning?

15     MR. KAISER:  Doing well, Your Honor.  Thank you.

16     THE COURT:  Welcome back.

17     MR. KAISER:  Yes, sir.

18     THE COURT:  Did you have the opportunity to

19  visit with Mr. Lung'aho this morning before we got

20  started?

21     MR. KAISER:  Yes, sir.

22     THE COURT:  Do you have any concerns about the

23  clarity of his mind?

24     MR. KAISER:  No, sir.

25     THE COURT:  Have you communicated with him

1  regularly and frequently in recent weeks and months?

2          MR. KAISER:  Yes, Your Honor.

3          THE COURT:  Good.  From your perspective, is the

4  lawyer-client relationship in tact?

5          MR. KAISER:  Yes, sir.

6          THE COURT:  Will you confirm for me that you've

7  reviewed the various versions of the PSR with him?

8          MR. KAISER:  Yes, I can confirm that.

9          THE COURT:  Good.  Mr. Lung'aho, I find first

10  that your mind is clear, you're competent in the law's

11  word, and I also find that you're satisfied with Mr.

12  Kaiser's work for you so far in the case.  So we will

13  press on.  All right?

14          THE DEFENDANT:  Okay.

15          THE COURT:  Good.  It's now time for that under

16  seal proceeding.  Given the number of folks that we have

17  present, counsel, I'd ask you and Mr. Lung'aho to join me

18  in the lockup here off the courtroom.

19      (Sealed proceedings under separate cover.)

20          THE COURT:  We are back on the public record.

21      Counsel, turn with me, please, to this -- to this

22  presentence report.  I believe the final version that

23  Officer Powell worked on -- and I should have acknowledge

24  her, Probation Officer Powell who is in the courtroom.  I

25  believe the final version is dated November 1, 2023.

1     Mr. Kaiser, do you agree that November 1 is the
2  final?
3          MR. KAISER:  Yes, Your Honor.
4          THE COURT:  Do you have it?
5          MR. KAISER:  Yes, Your Honor.
6          THE COURT:  And you told me earlier that you
7  reviewed all versions of the PSR with Mr. Lung'aho.  That
8  include this one?
9          MR. KAISER:  Yes, Your Honor.
10          THE COURT:  Any objection to this final PSR?
11          MR. KAISER:  No, sir.
12          THE COURT:  Mr. White, same questions and one
13  more.  Do you agree that November 1 is the final?
14          MR. WHITE:  I do, Your Honor.
15          THE COURT:  Do you have it?
16          MR. WHITE:  I have.
17          THE COURT:  Does the United States have any
18  objection to it?
19          MR. WHITE:  We do not.
20          THE COURT:  What is the United States' position
21  on offering Mr. Lung'aho the third point off the advisory
22  guideline calculation for accepting responsibility?
23          MR. WHITE:  Ask the Court to offer -- to award
24  that third point to him, Your Honor.
25          THE COURT:  The United States' motion is

1  granted.

2      Mr. Lung'aho, I'm sure you remember from your plea

3  agreement with the United States that you are entitled to

4  credit for taking responsibility for your actions, but the

5  amount of credit depended upon your behavior between the

6  plea and the sentencing date.  What just happened is

7  Mr. White asking me to give you as much credit as possible

8  because you haven't done anything inconsistent with your

9  fessing up, I will say, between the plea and the

10  sentencing.  I will do that.  I will give you as much

11  credit as possible on that issue.

12      Counsel, double check me on my advisory guideline

13  calculation.  Mr. Lung'aho's total offense level is 24.

14  He's in criminal history category II.  So the guidelines

15  recommend 60 to 71 months in prison, one to three years of

16  supervision after prison.  That's time when you would be

17  under the thumb of the probation office.  The guidelines

18  do not recommend probation.  They suggest a fine of

19  between 20,000 and $200,000.  There is restitution in the

20  case.

21      Counsel, please tell me here in a minute if that

22  restitution amount is agreed.

23      The fact of restitution is mandatory.  I believe the

24  amount to be $86,099.37.  There's a $100 fee called a

25  special assessment that the law requires me to impose in

1   just about every case, Mr. Lung'aho, and I believe it

2   applies here.

3        That's my advisory guideline calculation with letting

4   the amount of restitution hang fire for a moment.

5        Any objection, Mr. Kaiser?

6             MR. KAISER:  No, Your Honor.

7             THE COURT:  Mr. White?

8             MR. WHITE:  No, Your Honor.

9             THE COURT:  Very good.  I'll adopt the

10  presentence report without change as part of the basis for

11  my sentence.

12       Again, Officer Powell, I thank you for your work.  I

13  will note the third point off in the judgment itself, so

14  no change needed there.

15       Mr. Kaiser, I received and appreciated your timely

16  sentencing memorandum and with its attached letters from

17  friends and family members.  I have read and digested all

18  of that and will consider all of those materials and your

19  arguments in making my decision.

20       I look forward now to hearing whatever it is each of

21  the lawyers has to say.

22       Mr. White, what's the United States' position?

23             MR. WHITE:  Can I come up here, Your Honor?

24             THE COURT:  I wish you would.  I hear better

25  when you're closer.

1          MR. WHITE:  Your Honor, as the United States

2     told the Court at Mr. Lung'aho's change of plea and as is

3     reflected in our plea agreement, the United States is

4     asking the Court to impose 84 months imprisonment for the

5     course of violent conduct that he engaged in over what

6     turns out to be almost two months:  The firebombing of two

7     vehicles and the attempted firebombing of a third.  And we

8     consider that to be the just and appropriate sentence

9     under these circumstances to take into account all of his

10     criminal conduct as is reflected in what I told the Court

11     at the change of plea as well as what's reflected in the

12     presentence report.

13          If it please the Court, I'll kind of tell the Court

14     why I think those sentencing factors that are part of the

15     sentencing analysis make that a just and appropriate

16     sentence.

17          THE COURT:  I look forward to the elaboration.

18          MR. WHITE:  Taking the violent course of conduct

19     first, I just think about, you know, there were -- there

20     was an attempt to burn a Little Rock Police Department car

21     on August 25-26 as is reflected in paragraph 9 of the

22     presentence report.  Two Molotov cocktails were hurled,

23     but neither one of them exploded.  On the 28th was the

24     burning of the state police car as well as slashing tires,

25     breaking glass, windows, spray painting the cars.  And

1   then on the 31st of August was not a Molotov cocktail, but

2   the defacing of a billboard on the highway followed on

3   September 3 of 2020 by Mr. Lung'aho's complete destruction

4   of a car in the North Little Rock Rose City substation

5   parking lot.  Those -- those things are violent.

6        I know that in his sentencing memo, Mr. Kaiser says,

7   well, this was not a crime of violence.  And while

8   arguably that's a term of art in the real world, you know,

9   that -- these were violent crimes.  I thought that it was

10  notable, even what Mr. Kaiser told the newspaper after the

11  Eighth Circuit's opinion, this is one of those legal

12  situations that make people hate lawyers.  Is arson a

13  crime of violence?  Colloquially, the answer is yes.  But,

14  legally under this weird approach that we lawyers use,

15  it's not.

16       I think that pretty much sums it up.  Violence is

17  just the harmful or destructive use of physical force, and

18  that's -- violence is -- hurling a Molotov cocktail and

19  slashing tires and breaking windows is violent conduct.

20       What stands out to me even more is not just the way

21  that I characterize it, but the way that Mr. Lung'aho has

22  characterized it in his sentencing memo.  He said, radical

23  action -- which I think I've heard it call direct action

24  or radical actions is the term of this violent conduct --

25  was the only way to let the system know, stop killing us.

1  And he goes on to affirm that it was an attack on the

2  institution of the American police structure.

3       When I read that, I thought about the guidelines

4  section 3A1.4 that defines a federal crime of terrorism by

5  reference to a particular statute, that defines the first

6  -- first conjunctive there is conduct calculated to

7  influence or affect the conduct of government by

8  intimidation or coercion or to retaliate against

9  government conduct, which -- which is exactly what he said

10 that he did and is what he did.

11      The nature of the conduct was illegal, violent, put

12 other people at risk.  It's fortuitous that the fires in

13 these cars only were fires and not explosions, whether

14 there was just a passerby in the area, whether there was

15 an employee who happened out from one of the agencies, or

16 whether even the first responders were put at risk during

17 their response to these fires.

18      So the nature and circumstances of the offense I

19 think militate toward a significant punishment.  And then

20 when I think about the history and characteristics of the

21 defendant -- does the Court mind if I get my bottle of

22 water?

23          THE COURT:  Not at all.

24          MR. WHITE:  When I think about the history and

25 characteristics of the defendant, I think about not only

1    what's described in the presentence report about his

2    upbringing, but also what's in the sentencing memorandum,

3    as the Court mentioned a moment ago, as well as the

4    letters of support, which were many and were very positive

5    and talked about Mr. Lung'aho's youth and his upbringing.

6    And what's remarkable to me is the amount of support and

7    encouragement and opportunity and, you know, privilege

8    that he experienced growing up.

9        When I read not only the presentence report, but his

10   sentencing memo about his mom's involvement in his life,

11   that's remarkable.  When I consider the story of his

12   father and the privilege that Mr. Lung'aho had to see a

13   man redeemed from life in the 'hood to the life that is

14   reflected in the presentence report and his sentencing

15   memo, when I read about the relationship he had with his

16   brothers, his -- you know, he -- the education that he

17   had.  He went to Horace Mann, which I went to.  He

18   graduated from Parkview where I graduated.  Went to

19   Loyola, attended Pulaski Tech, and even got a certificate

20   from Arkansas Workforce Services.  He's had all this

21   package of things and then -- which is -- which is really,

22   you know, his comment in the sentencing memo, I lived in

23   the 'hood but I was raised away from the 'hood, that is

24   exactly what's reflected in the presentence report, in the

25   sentencing memo, and in the letters.  It was -- it reads

as though it was a great and positive environment.

All this, and yet in his eyes he is a victim who's continually making excuses and not reflecting any remorse over the conduct that he's engaged in. He's adamant that he has no regret and no remorse. I have never seen or heard a defendant before this court or any court in this courthouse who so audaciously represents that he is not sorry. His -- I really haven't. No remorse for the damage he caused that ultimately affects the taxpaying community that he purports to care about or for the risk that he placed people in, as I said, whether the innocent passerby or the first responders.

And this one is -- this one is a little bit different because he -- he says he's sorry that his arrest created a chilling effect on other protests which is -- which is just such a false narrative. What happened is, is that his conduct is what created the chilling effect on other protesters. There were other people, and I've been told of them, who are citizens in our community who wanted to go to the peaceful protest, but were afraid that violence would break out, just like it did, and didn't.

And even one of his codefendants, during an interview, said that she finally broke away from the group because she was disillusioned by the tactics. She was not disillusioned by the police presence. She was

1    disillusioned by Mr. Lung'aho's tactics.

2         And so the idea that -- anyway, he does not express

3    remorse for his own -- for the consequences of his own

4    conduct on the peaceful protesters in our community who

5    wanted to protest.  I think that's significant.

6         He complains that the United States sought his

7    pretrial detention because of his race, but fails to

8    acknowledge that that very system about which he complains

9    released him on conditions of release.  He complains about

10   being in jail, but fails to acknowledge that it was only

11   after three or four hearings that the magistrate judge

12   finally concluded that he simply was not going to comply

13   with conditions and there was no option but to -- to

14   detain him pretrial.  He complains about being put in the

15   hole at the jail without acknowledging any of his

16   violations of the rules there.

17        And what emerges from the presentence report and his

18   own sentencing memo and those letters is a young man who

19   -- he's embraced a paradigm that he's a victim.  He's the

20   perpetual victim despite the remarkably supportive

21   environment in which he grew up.  It's resulted in his

22   remorseless violent conduct and his unapologetic refusal

23   to comply with the rules.  I'm right, you're wrong, I'm

24   the victim.

25        This lack of remorse and kind of fault-free rule

1  violations to me reflect on that factor of the sentencing

2  structure, that specific deterrence, because Mr. Lung'aho

3  hates that he got caught but is not apologetic about his

4  conduct and makes excuses for his violations of -- his

5  continued violation of the rules.  And I think that that

6  is a factor that the Court can consider when it considers

7  specific deterrence.

8       General deterrence.  That's, essentially -- the point

9  of general deterrence is along the lines of actions speak

10 louder than words.  We want the community -- we want the

11 sentence to be public and publicized and communicated to

12 the community, those who might commit other conduct to

13 know that it cost and those who -- those who are the

14 victims or those who are put at risk to know that the rule

15 of law is going to protect their community and ensure

16 their safety and an ordered society.  And I think that

17 both specific and general deterrence are significant

18 factors in here.

19      I wrote to myself that a stiff sentence for this

20 course of conduct ought to declare that the rule of law

21 stands in our community.  And I'll tell the Court, I can't

22 swear to this.  My concern is, is that if Mr. Lung'aho is

23 sentenced to the -- to only what the Court has to sentence

24 him to, that that might -- that might communicate

25 something that it ought not to.  That's -- that's -- I'm

1    concerned about that.

2         I read something that Attorney General Garland said

3    not too long ago when -- he was talking about the time

4    when a particular prosecution is considering conduct

5    that's kind of at the intersection of ideology and crime.

6    He said that we do not prosecute ideology; we prosecute

7    conduct.

8         And despite Mr. Lung'aho's arguments otherwise, his

9    prosecution and that of his codefendants -- there are

10   four.  One's already been sentenced, three more to go.  --

11   is a prosecution of his conduct, his violent criminal

12   conduct.

13        And from all accounts, literally, he was the leader.

14   Others moved in and out of the various incidents, but he

15   was present every single time.  He made the destructive

16   devices, he cut the fences, he hurled the firebombs.

17        It was not his race that led US Attorney's office to

18   seek his detention pretrial; it was his role in the

19   offenses and his conduct.  And it's not his race that

20   causes me to urge the Court to sentence him to 84 months;

21   it was his role and his conduct, a continuing course of

22   conduct.

23        In his plea agreement, he has received a number of

24   concessions.  He's facing only one count rather than

25   three.  The statutory maximum is 20 years, but we agreed

1    to ask the Court for no more than 84.  I think the
2    guidelines section 3A1.4 applies to him, but we have
3    agreed it away.  It's actually a provision that deals
4    with, if a federal crime has occurred that would qualify
5    as a federal crime of terrorism, then the offense level is
6    32, the criminal history category is XI, making the range
7    210 to 262.  As part of our plea agreement, we agreed that
8    away, Your Honor.  We also compromised on the
9    leader/organizer specific offense adjustment.
10        84 months will appropriately reflect the seriousness
11   of the offense and promote respect for the law and provide
12   just punishment.
13        I do want to touch on a couple of more things.  One,
14   in his sentencing memorandum, Mr. Lung'aho argues about
15   disparate sentences.  And he points out a couple of cases
16   that occurred in the northeast United States.  I'm sure
17   the Court is familiar with that argument that he made in
18   the --
19             THE COURT:  Yes.
20             MR. WHITE:  -- footnoted articles.  I think
21   about the differences on those just factually based on the
22   newspaper article.  Those were isolated incidents, one
23   offense that happened on the spur of the moment, according
24   to the articles.
25        What we don't know is kind of what happened during

1    the lengthy negotiations.  We don't know kind of where the
2    different parties fell, was there any cooperation.
3    There's just not enough facts in the newspaper article for
4    that to be a fair comparison.
5        What the Court does have is the five defendants
6    before it.  And I think there is going to be an
7    appropriate basis for there to be differences in those
8    sentences.  Some of the -- some of the -- some of the
9    codefendants may have cooperated, some of them may have
10   participated less.  None of them was the leader that Mr.
11   Lung'aho was.  There just were -- there were enough
12   differences that, to the extent at the end of today if
13   there are different sentences for the different
14   defendants, they're appropriately different.
15       And as I was reflecting on Mr. Lung'aho's sentencing
16   memo particularly, I just was thinking, this -- our
17   prosecution of Mr. Lung'aho and his codefendants is not a
18   prosecution of ideology.  What he -- his criminal conduct
19   that he engaged in was not a protest.  A protest is riding
20   the bus or refusing to give up your stool at the counter,
21   standing on the bridge, or walking into high school.  It's
22   not hiding under the dark of night in a parking lot when
23   nobody's around and throwing firebombs into police cars.
24       It gave me a little bit of anxiousness when I thought
25   about being here, which -- the significance of which is

not lost on me and I'm sure it's not lost on the Court.
But I think about those nine who walked into school in the
face of words and actions that were informed by a false
narrative, people who -- people who were driven by a false
narrative, and yet there was that insistence, we're still
going to walk.

     And the proceedings here.  Justice Marshall was here.
Judge Davies sat at the bench that this Court is going to
have here before long.  What we don't know is what Judge
Davies' personal -- whether he had personal sympathies
toward this false narrative or was antagonistic toward the
false narrative.  What we know is, is that as Article
III, he stood for the rule of law and ruled in accordance
with the rule of law.

     I just think that Mr. Lung'aho's sentencing memo is
replete with a false narrative and that that should not
define how we proceed today and his criminal conduct is
what's at issue and is what I believe makes it appropriate
for the Court to sentence him to 84 months.

          THE COURT:  Thank you, Mr. White.

          MR. WHITE:  Thank you, Your Honor.

          THE COURT:  Mr. Kaiser, I look forward to
argument on behalf of Mr. Lung'aho.

          MR. KAISER:  Yes, Your Honor.

     Thank you, Judge.  First, I just want to correct some

1    factual misstatements the government just made. This
2    wasn't a period of two months. It was a week. The
3    presentence report makes it clear, late August, early
4    September.
5         Again, the government cannot concede its initial
6    charging error even after this Court and the Eighth
7    Circuit have told it it was wrong. This is a nonviolent
8    offense despite the colloquialism, what the dictionary
9    says, what I said in the paper. Of course, you and the
10   Eighth Circuit have made that clear.
11        Again, the government said it was four or five
12   hearings. It was two hearings that were split into two
13   parts because the first part took too long when he was
14   detained. So I just wanted to make those factual
15   corrections.
16        The government's attempt to compare this case to a
17   911-style act of terrorism is ridiculous, it's unveiling,
18   it is insulting to the victims of genuine acts of terror
19   along those lines.
20        How the United States is trying to, essentially,
21   argue affluenza about a kid from Rose City/North Little
22   Rock is beyond me. I think the government just argued
23   that my client was lucky to have a drug addicted father
24   and grow up in a lower socioeconomic status part of North
25   Little Rock. I don't know how that argument could be made

1    with a straight face, but I just heard it.

2         The government argues about privilege.  This whole

3    thing is about privilege.  So for the government to try to

4    turn it around to such a willful ignorance and blindness

5    to the issues at play here.  The privilege to see a drug

6    addict almost destroy a family and still have the lasting

7    impact of that drug addiction two generations later.  What

8    a privilege.  Going to the same schools does not mean

9    coming from the same background.

10        The United States' sentencing argument shows its

11   continued ignorance about the various issue this whole

12   case, the whole indictment, the whole summer of 2020 was

13   about.

14        The deterrent effect is there.  Anyone who sees this

15   prosecution knows that the United States will charge you

16   illegally, to threaten a life sentence for this type of

17   conduct.  Five years, even if this Court gives the

18   minimum, would be among the highest sentences in the

19   country for this type of action that occurred during this

20   turbulent time of our nation's history.

21        The government attempts to distinguish the New York

22   lawyers and the other incidents that we refer to in our

23   sentencing memorandum.  However, those occurred during

24   public protests near a bunch of other people.  So I would

25   argue they are distinguishable in that sense in that

1    someone was actually at danger; whereas here, no one was.

2         The United States' attempt to invoke the Little Rock

3    Nine to seek more time, more jail time for a nonviolent,

4    black, nonfelon is wild.  I don't have a response to that

5    just to point out what it is.

6         The government charged this case here so it could

7    charge the 30-to-life enhancements that this Court

8    correctly dismissed and the Eighth Circuit affirmed

9    despite their continued assertions it's a violent offense.

10   And now the government asks this Court to set what would

11   be the single highest sentence nationwide for this type of

12   conduct from this turbulent summer of 2020.

13        The government asked us to just trust them on

14   determining where the line is in terms of what makes arson

15   a federal crime.  The North Little Rock Police Department,

16   as this Court recognized, received just $37,000 of its $24

17   million budget from federal funding.  Now it wants this

18   Court to trust that sentencing this person to seven years

19   -- again, the highest sentence of its kind in the country

20   -- is the just course in light of its initial charging

21   error, but this Court really shouldn't do that as the

22   government has shown us throughout this case and the way

23   it has charged it and pursued it that we cannot trust it

24   to apply the law correctly or justly.

25        The sentencing memo, the support letters, this crowd

of people show my client's community ties.  He is the
community.  That is all that he cares about.  He has
already served multiple years on almost complete lockdown
in a small rural county jail.  He has spent nearly a year
of that in the jail -- or in the hole for infractions as
serious as having an extra towel.  That's contraband.  Or
having a blanket in the dayroom.  Also contraband.  His
life and the life of his family have been forever altered.
He has to deal with the psychological trauma of facing an
errant charge carrying a possibility of a life sentence
times three.

        The minimum is appropriate here.  The guidelines
range, it is 60 to 71, but it would be 57 to 71 but for
the statutory minimum.  The minimum is within that range.
Alternatively, we would ask this Court to sentence within
the guidelines up to 71 months rather than the 84 month
sizable variance that the United States is requesting.

        This Court cannot reward the government's conduct in
this case with the requested variance.  This nonviolent
property crime committed by a nonfelon during perhaps the
most heated period of our nation's recent history should
get the minimum.  The lawyers in New York got a year.  The
codefendant Ms. Jeffrey got 18 months.  My client should
get the minimum accordingly.

        The saddest part of this whole case is that it is

providing and will continue to provide a stark example of the very injustices my client and his codefendants have been protesting for years.  We ask the Court to stick to the guidelines and to end my client's nightmare just a little bit sooner than the government is asking for.

Thank you.

THE COURT:  Question, Mr. Kaiser.

MR. KAISER:  Yes, Your Honor.

THE COURT:  At page 9 of your sentencing memorandum, you say the following in the first full paragraph near the bottom:  Quote, he admits to and is fully prepared to accept the consequences of his actions but makes no apology for his release.  I'm with you so far.  Or his actions.

Is that last part correct?

Your brother White emphasized the lack of remorse or apology, and this seems to me to confirm that.

Is that Mr. Lung'aho's position?

MR. KAISER:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.

MR. KAISER:  Yes, sir.

THE COURT:  Mr. Lung'aho, pardon me.  Now is your opportunity to speak if you wish to do so.

THE DEFENDANT:  I do.

THE COURT:  Please come forward.  I look forward

1  to hearing from you.

2       THE DEFENDANT:  I think that this is

3  interesting, what I've just heard from the prosecution in

4  arguing for the 84 months.  I can see and understand the

5  perspective of that side of things, but I think, as my

6  attorney has brought forth to your attention, it also

7  requires a willful ignorance to certain other aspects of

8  things.  One of the things I would like to mention is my

9  conduct leading up to my -- my indictment or the criminal

10  acts that I did take.

11      One of the reasons why I feel there is a lack of

12  apologetic-ness or apology for my behavior is because of

13  the fact that there is a documented history of peaceful

14  protesting, of advocating to city politicians, of

15  advocating for the community in the right way, or as the

16  prosecution would have defined a protest of -- as a sit

17  down or not giving up a seat on the bus.  There has been

18  documented history on my behalf in that same regard, but

19  there's also been a recurring response from those that we

20  petition to to either harass or to just all out reject any

21  efforts that we put forward.

22      In the year of 2020, those rejections escalated to a

23  new level which made it seem as if there was no other

24  course of action.  The reason why there would be a lack of

25  apology in those actions is not because I don't feel

1  remorse.  There is a large level of remorse.  It's

2  actually a little bit more clarified in the sentencing

3  memorandum in regard to the effects that my actions have

4  had on my community.  I am but a disciple of my community.

5  So in realizing how my actions have had that affect on my

6  community, those things I do apologize for, not just my

7  absence from the community, but the ripple effects that it

8  has had on my community.

9      But in regard to standing up for what I believe in

10  and the injustices that are executed on my community, not

11  just me alone, because one thing that the prosecution

12  failed to mention is that I am a victim of those very same

13  things that I advocate against.

14      The reason why I'm so passionate about them, the

15  reason why I go as far as I have is because I have dealt

16  with those things firsthand, being assaulted by police

17  with no reason, being harassed, these things.  Those are

18  things that happen on a daily basis to many people and

19  something I'm very passionate about because of my own

20  experience, and even in that passion have pursued the

21  right way of protesting.  And even though that has done --

22  that's been done time and time again, I have reached a

23  point of almost a slap in the face from my own government,

24  the same people who are supposed to uphold these laws or

25  these societal norms that are supposed to protect us would

then use those same laws or same privileges to then exact injustices.

And so when meeting those types of circumstances, in this particular heightened time in history, I felt that there was a need for action.  And just like a Boston Tea Party, which would historically be revered as a protest where people came at the cover of night to make a stand to build the very foundation for this nation that we live in, I felt that there was a need to take a similar course of action to be heard and for the people in my community to know that they were going to be heard.

That is the reason why I am not apologetic for my actions, not because I'm not sorry for the effects that have come as a result of them, but because I felt that there was a necessity for these things.  I still feel that that was the case in 2020.

Moving forward, as a result of the circumstances that I witnessed and the effects on my community, these are things that I don't feel would be necessary to do because I've now witnessed firsthand what happens to my community when this radical action is taken.  I do straddle that line of being apologetic but not being apologetic, if that makes sense to the Court.

There is -- excuse me just a second.  There is a bit of necessity I feel that needs to be considered by the

1  Court in looking into my actions and determining how to
2  sentence me.  One of the reasons why I'm asking for the
3  minimum sentence is because of that.
4        The prosecution spoke of some privilege.  I don't
5  come from privilege.  That's not in my background.  I've
6  become to be an educated man despite of my circumstances.
7  You know what I mean?  It's not that I was privileged and
8  given these opportunities.  These opportunities had to be
9  snatched, had to be taken advantage of whenever they came,
10 and that's what got me to where I'm at, but it also paved
11 the way for my passion for my community as well because of
12 the circumstances that I come from.
13       That's all I've got to say.
14            THE COURT:  Thank you, Mr. Lung'aho.
15       Counsel, I appreciate your work.  And, Mr. Lung'aho,
16 thank you for speaking.  That helps me.
17       I need to let my mind come to rest about this.  We'll
18 be in recess for a few minutes.  Y'all can keep your
19 seats.
20       (A recess was taken at 9:59 a.m. until 10:14 a.m.)
21            THE COURT:  Everyone can be seated.
22       Thank you for your patience with me.  Again, counsel,
23 I appreciate your argument.  And, Mr. Lung'aho, I
24 appreciate your words.  Lung'aho.  Apologies.
25       All material things considered, I believe that the

just and fair sentence is five and a half years, Mr. Lung'aho, 66 months.

The -- I find myself agreeing strongly with many of the things that the United States said, and the Court -- this Court does sit to ensure that the rule of law is followed.

It is deeply troubling to me, Mr. Lung'aho, and the reason -- or one of the reasons that I come to the sentence is that you don't admit the wrongness of your conduct. It was wrong. The constitution protects the important right of the people to peaceably assemble. And there is always, I suppose, in times of extraordinary circumstances, the right of revolution, what Locke called an appeal to heaven, when all the rules are off and people move to overthrow the government. That was what was happening at the Boston Tea Party. But those were not our circumstances in the summer when you led these efforts.

I understand that you had made efforts to work within the system, but I firmly believe, imperfect as it is, that our system is open to change and does change over time as the people pursue in the right way efforts to make our laws better and more just.

Mr. Kaiser, you -- as I hope my order made plain and what happened here was not a crime of violence as that -- that is a legal term of art. Only a lawyer could love

1    that phrase because what was done was violent.  And that

2    is precisely what concerns me and why I come to the

3    sentence that I do.

4         The -- this word "privilege" has been talked about in

5    the courtroom.  The -- what I see and what I understood

6    the United States to be arguing is that you had had --

7    compared to many of the defendants that come through the

8    door and that are in here, you've had many advantages in

9    the growing up years with parents who were present and

10   those at your church, the letter that I got from the

11   pastor that talked about his mentorship of you and the

12   good work that you had done with him.

13        The lawyers and I see far too often the broken lives

14   of young people -- I've seen a number of them in the last

15   couple of weeks -- who not only have had no family

16   support, but who have been broken by their families.  I

17   recall one young man whose mother sent him out to sell

18   drugs as a child, that kind of thing.

19        You had many blessings as a child, looking at our

20   world as a whole. Challenges, too, of course, but the

21   sentence has to reflect your role as a leader in all of

22   this.  It has to -- if not change your mind, it has to,

23   Mr. Lung'aho, in my judgment give you the opportunity to

24   think further about whether -- whether the resort to

25   violence was called for here.  And in terms of general

deterrence, it has to cause others to think hard and long before deciding to engage in violent acts like those that you were involved in.

Terrorism is probably too strong a word for it. It is too strong a word; vandalism, certainly, and vandalism directed at the government, vandalism that created, as the United States said, the opportunity for not only harm to people -- or I'm sorry -- harm to property, but also harm to people. And law in its essence is designed to protect people one against the other, the weak against the strong, all against all, and our law just can't tolerate the violence that was engaged in.

I don't know everything about the case, of course, but -- but from what is available to me in the public record, I see nothing in the conduct of the United States that is contrary to the interest of justice. Our prosecutors are charged with protecting the public, and they do a good job of it. They're human like all of us, so they make mistakes like me and you. And they are zealous in their work as they're supposed to be, but the system wouldn't function unless we had zealous lawyers on both sides and a person in the middle whose job it was to be neutral and make decisions, albeit imperfectly.

The conduct deserves a serious sentence. I'm not persuaded by the comparisons with other cases across the

country, and I believe that the five and a half years, the 66 months, captures all the mix of factors that I'm supposed to consider.

It also weighs on me, and I alluded to this earlier, not only your role in the case, Mr. Lung'aho, but also the sentences for the codefendants. I've sentenced one to approximately 17 months in prison. I have others to sentence today. My deputy wishes I would get on with it and get to it because we're already running behind on the schedule, but we will get there. More important to do things right than to do them right now.

But at any rate, I have to be fair within the case. And it seems to me that both the higher sentence that the United States has requested, though I understand the request, and the lesser sentence that has been -- that you have argued for, Mr. Kaiser, that that would -- that would not be fair in the context of other defendants.

So five and a half years. I'm going to make various recommendations to the Bureau of Prisons: That you participate in residential drug abuse programs, Mr. Lung'aho, or other substance abuse programs if you're not eligible for RDAP; that you participate in mental health counseling; that you participate in educational and vocational programs. I'm happy to recommend a particular place to the Bureau perhaps so family could visit. Mr.

1    Kaiser will tell me about that in a moment.

2        I'm going to impose three years of supervision, and
3    that's the most that the statute allows.  I do that
4    because of a point that the United States made in its
5    argument about noncompliance with the conditions of
6    supervision while you were on pretrial release.  It is
7    important that the Court ensure that you make better
8    choices in terms of controlled substances and compliance
9    with orders and directives of the probation office.

10       So there's some mandatory terms that will apply
11   during this three years.  You may not commit a state,
12   federal, or local crime.  You must get a DNA sample if the
13   officer asks you for one and the law allows it.  And you
14   may not use or possess a controlled substance without a
15   doctor's prescription.

16       There are 13 standard conditions of supervision in
17   our district.  I'm not going to recite them all.  You are
18   a well-educated man, Mr. Lung'aho, and you can read them
19   in the judgment.  In general, they're do-right rules.  Do
20   what your probation officer says, don't move or change
21   your job or phone number without alerting the officer in
22   advance, and you may not associate with those that you
23   know are involved in criminal activity and you may not
24   possess a gun or ammo or any other dangerous weapon or
25   device such as the Molotov cocktails here.

In addition, some special conditions of supervision: Continued mental health counseling, continued substance abuse treatment under the guidance of the probation officer, regular and random testing.

And then in connection with the restitution obligation that the law requires me to impose, you have to disclose all of your financial circumstances to the probation office, bank records, tax returns, things like that, and you may not borrow money without getting pre-approval from the probation office. That could be for a vehicle or new credit card or whatever it might be, but the office -- and this is another reason for the extended period of supervision. The office is entitled to keep a close eye and check on your finances to be sure that, to the extent you're able, you're paying the restitution back, paying the restitution amount.

I'm not going to impose a fine. I do not believe you have the meaningful ability to pay one either now or over time, especially given the restitution obligation, which needs to be your priority and needs to be paid back as you, along with your codefendants, do your part to make the state police and the Little Rock Police Department whole for the damage to their property.

The restitution amount -- and not just those two entities, but all of them. The total restitution amount

is $86,099.37.  I have specific amounts here in the
judgment to the state police, the LRPD, the Arkansas
Insurance Department because it reimbursed the state
police for some of the losses, the North Little Rock
Police Department, the Arkansas Municipal League, the
Shannon Hills Police Department.  All of these details
will be specified in the judgment as to the particular
amount of restitution that you owe to each of those
entities.  And as I said, the restitution is joint and
several with your codefendants.

You must also pay the $100 special assessment that is
required in almost every case.  And all of this, the
restitution and the special assessment, is due and payable
immediately.  If you can't pay it immediately, which, of
course, you cannot given your finances, then up to 50
percent of what's available in your prison -- on your
prison books can be pulled out each month to go toward
restitution obligation.  It will be shared pro rata among
all of the payees.

You will I'm almost certain still owe money when
you're released from prison.  At that point, you must pay
ten percent of your gross monthly income, at least ten
percent to satisfy this restitution.  It will come off of
the top.  If the amount can change -- that amount can
change.  That's between you and the probation office and

1    the Court, but ten percent is the floor.

2        All material things considered, that's the sentence

3    that I intend to impose.

4        Mr. Kaiser, is there any request for clarification?

5            MR. KAISER:  No, sir.

6            THE COURT:  Is there any gap that I need to

7    fill, any omission?

8            MR. KAISER:  No, Your Honor.  We just requested

9    BOP -- recommended BOP placement.

10            THE COURT:  Which is?

11            MR. KAISER:  First choice, Texarkana.  Second,

12    Forrest City.  Third, Yazoo City.

13            THE COURT:  All of those -- Mr. Lung'aho, are

14    all of those places designed to be close to people and

15    friends and family especially?

16            THE DEFENDANT:  Yes, sir.

17            THE COURT:  Very good.  I will make that

18    alternative recommendation to the bureau.  Underline the

19    word "recommendation" because I can't promise.  The bureau

20    decides, not me.

21        Mr. White, any request for clarification?

22            MR. WHITE:  No, Your Honor.

23            THE COURT:  Any gap that I need to fill?

24            MR. WHITE:  I don't believe so, Your Honor.

25            THE COURT:  Okay.  Thank you.

1        Mr. Lung'aho, I need you to stand so that I can
2    formally impose the sentence on you.
3        Mujera Benjamin Lung'aho, it is the judgment and
4    sentence of the Court that you be incarcerated in the
5    Bureau of Prisons for five and a half years, 66 months,
6    with all of the recommendations to the bureau about
7    programming and placement that I spoke before; that you be
8    supervised by the probation office of the Eastern District
9    of Arkansas for three years after you're released from
10   prison with the mandatory conditions I spoke, all 13
11   standard conditions, whether I spoke them or not, and the
12   special conditions that I spoke before: mental health
13   counseling, drug treatment, and testing, as well as
14   complete financial disclosure to the probation office and
15   limitations on what you can do with borrowing money; that
16   you pay the agreed amount of restitution, the total being
17   $86,099.37 to all the payees listed in -- that will be
18   listed in the judgment in the shares listed, and the $100
19   special assessment with the restitution being joint and
20   several among you and your codefendants, and on the
21   schedule that I outlined before; no fine because of no
22   meaningful ability to pay either now or over time.
23       That's the judgment and sentence of the Court for the
24   reasons stated.  You may be seated.
25       Subject, Mr. Lung'aho, to the terms of your plea

1   agreement, you have the right to appeal, to take your case

2   to other judges, and argue that I have made mistakes or

3   that there have been mistakes in the case.  There is a

4   quick and strict deadline for you to give notice of

5   appeal.  Within a few days, I'll finish and file the

6   written judgment in your case.  When I do, you have 14

7   days, but only 14 days to file a notice of appeal.

8         Do you understand the deadline?

9             THE DEFENDANT:  Yes.

10            THE COURT:  Good.  Mr. Kaiser, of course, would

11  do that paperwork for you, but he needs to know your

12  decision sooner rather than later.  Do not tell me, but

13  talk with him about it this morning before you leave the

14  courthouse.  Okay?

15            THE DEFENDANT:  Yes.

16            THE COURT:  Thank you.  The reason I press you

17  to have that discussion and emphasize your 14-day deadline

18  is that, if you do not file a notice of appeal within

19  those 14 days with our clerk of court, you will lose

20  whatever appeal rights you retain under the judgment.

21  They will evaporate.  You with me?

22            THE DEFENDANT:  Yes.  I want our record to be

23  clear that, not withstanding my respect for Officer Powell

24  and her colleagues in the probation office, it is not my

25  habit to read the recommendation from that office about

1    what the sentence should be, and I have not read or relied
2    upon such a recommendation here.
3         Mr. Lung'aho, if you have questions for me, I'm open
4    for business, but I want you to run them by Mr. Kaiser
5    first so his hair doesn't catch fire.  Okay?
6              THE DEFENDANT:  Yes.
7              THE COURT:  Take a moment if you do.
8              MR. KAISER:  No question, Your Honor.
9              THE COURT:  Counsel, any other ground to cover?
10             MR. WHITE:  I don't believe so, Your Honor.
11             THE COURT:  Very good.  I appreciate your work,
12   counsel.  Court's in recess.
13        (Proceedings adjourned at 10:35 a.m.)
14                        *  *  *  *  *
15                   REPORTER'S CERTIFICATE
16        I, Valarie D. Flora, FCRR, RPR, certify that the
17   foregoing is a correct transcript of proceedings in the
18   above-entitled matter.
19        Dated this the 9th day of February, 2024.
20   /s/ Valarie D. Flora, FCRR
21   --------------------------
22   United States Court Reporter
23
24
25